JAMES P. VREELAND, JR., *ET AL.*, PLAINTIFFS-RESPON-
DENTS, v. HON. BRENDAN T. BYRNE, GOVERNOR OF
NEW JERSEY, *ET AL.*, DEFENDANTS-APPELLANTS.

MORRIS COUNTY TAXPAYERS ASSOCIATION, *ET AL.*,
PLAINTIFFS-RESPONDENTS, v. STEPHEN B. WILEY,
DEFENDANT, AND BRENDAN T. BYRNE, GOVERNOR
OF THE STATE OF NEW JERSEY, *ET AL.*, DEFEND-
ANTS-APPELLANTS.

Argued November 23, 1976—Decided February 11, 1977.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellants (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman* of counsel and on the brief).

*Mr. John P. Sheridan, Jr.,* argued the cause for respondents, James P. Vreeland, Jr., et al.

*Mr. Ralph Fucetola, III,* argued the cause for respondents, Morris County Taxpayers Association, et al.

The opinion of the court was delivered by

MOUNTAIN, J. This appeal presents the question of the constitutionality of the nomination of Stephen B. Wiley to the office of Associate Justice of the Supreme Court of New Jersey. The trial judge ruled that the nomination was unconstitutional as being in violation of N. J. Const., Art. 4, § 5, ¶ 1, which reads as follows:

> No member of the Senate or General Assembly, during the term for which he shall have been elected, shall be nominated, elected or appointed to any State civil office or position, of profit, which shall have been created by law, or the emoluments whereof shall have been increased by law, during such term. The provisions of this paragraph shall not prohibit the election of any person as Governor or as a member of the Senate or General Assembly.
>
> [*N. J. Const.,* Art. 4, § 5, ¶ 1]

The facts are not in dispute. Wiley was elected to the New Jersey State Senate in November, 1973, and took office January 8, 1974. His four-year term will expire January 10, 1978. In 1974 the New Jersey Legislature passed and there was enacted into law, a statute which, *inter alia,* increased the annual salaries of Associate Justices of the Supreme Court from $45,000 to $48,000. *L.* 1974, *c.* 57, effective June 28, 1974.[1] The enactment contains the following provision:

> The increases in salary provided for in this act shall not be applicable to any present member of the Senate or General Assembly during the term for which he shall have been elected should such member hereafter be appointed to any of the offices enumerated in section 1 of this act. [*N. J. S. A.* 2A:1A-8]

It will be noted that one of the offices enumerated in section 1 is "Associate Justice of the Supreme Court."

---

[1]The act is now *N. J. S. A.* 2A:1A-6 *et seq.*

On March 31, 1975, Associate Justice Frederick W. Hall retired from the bench creating a vacancy in the office of Associate Justice of the Supreme Court. On September 16, 1976 Governor Byrne nominated Senator Wiley to the office of Associate Justice to fill this vacancy. The New Jersey Senate confirmed the nomination with five dissenting votes. Because of the litigation which immediately ensued, Senator Wiley has not taken the oath of office as an Associate Justice, nor has he undertaken any judicial duties.

Two declaratory judgment actions challenging the Wiley nomination were promptly filed in the Superior Court, Law Division. The first, in Morris County, was brought by taxpayer groups against Senator Wiley, Governor Byrne, the President of the New Jersey Senate and the Attorney General. The second, filed in Mercer County by eight members of the New Jersey Senate, joined the Governor and the State of New Jersey as parties defendant. Both suits charged that Senator Wiley was ineligible, during the term for which he had been elected Senator, to be nominated to fill the vacancy in the Supreme Court, because the emoluments of that office had been increased by law during his senatorial term.

The two actions were consolidated. There being no disputed issues of fact, Judge Schoch, after hearing argument, rendered an oral opinion on September 30, 1976, holding the nomination invalid as in violation of N. J. Const., Art. 4, §5, ¶1, quoted above.

Defendants filed notices of appeal to the Appellate Division and then moved before this Court for direct certification and for an accelerated argument. Both motions were immediately granted.

Shortly after hearing oral argument, this Court, *sua sponte*, directed the parties to file supplemental briefs upon the issue, not theretofore raised, as to whether *N. J. S. A.* 2A:1A–6 et seq., containing as it does, *N. J. S. A.* 2A: 1A–8, set forth above, is in violation of *N. J. Const.*, Art. 4, § 7, ¶ 9(5), which states that:

The Legislature shall not pass any private, special or local laws:
*   *   *   *   *   *   *   *
(5) Creating, increasing or decreasing the emoluments, term or tenure rights of any public officers or employees. [*N. J. Const.*, Art. 4, § 7, ¶ 9(5)]

Four members of this Court are of the view that this statute, in its present form, is special legislation which violates N. J. Const., Art. 4, § 7, ¶ 9(5). All parties to the litigation concede that were it not for *N. J. S. A.* 2A: 1A-8, the nomination would clearly be in violation of N. J. Const., Art. 4, § 5, ¶ 1. Since the majority have concluded that the presence of *N. J. S. A.* 2A:1A-8 renders the salary statute unconstitutional in its application to legislator-appointees, and hence must be excised therefrom, it follows that the nomination cannot stand.

Three members of the majority, furthermore, agree with the trial court that even were the statute allowed to stand intact, the nomination would nonetheless do violence to N. J. Const., Art. 4, § 5, ¶ 1.

I

We first address the issue, as to the resolution of which there is majority agreement, whether *L.* 1974, *c.* 57, now *N. J. S. A.* 2A:1A-6 *et seq.* is, in its present form, special legislation increasing the emoluments of public officers and hence prohibited by N. J. Const., Art. 4, § 7, ¶ 9(5). The argument of course centers upon the final section of the act, which, for convenience, we restate here:

The increases in salary provided for in this act shall not be applicable to any present member of the Senate or General Assembly during the term for which he shall have been elected should such member hereafter be appointed to any of the offices enumerated in section 1 of this act.

[*N. J. S. A.* 2A:1A-8]

It is not disputed that the statute increases emoluments — indeed it has no other purpose and deals with no other

subject — nor that an Associate Justice of the Supreme Court is a public officer. Thus it seems conceded that the subject matter of the enactment falls within one of the categories of legislation that can constitutionally be enacted only by a general law. The only question at issue, then, is whether the statute constitutes special or general legislation.

The constitutional provision identifying certain subjects as eligible for treatment only by way of general legislation became part of the Constitution of 1844 by amendment adopted in 1875. It was carried into the Constitution of 1947 without substantial change. Similar provisions are to be found in most, but not all, of the constitutions of the other states. 2 *Sutherland, Statutory Construction* (4th ed. 1973) § 40.01. The purpose behind special law prohibitions has been stated thus:

> The legislative and judicial processes [have] developed along different lines . . . the legislative process lacks the safeguards of due process and the tradition of impartiality which restrain the courts from using their powers to dispense special favors. Over the course of time, as a result, the propensities of legislatures to indulge in favoritism through special legislation developed into a major abuse of governmental power.
>
> As the bulk of special laws grew, demands for reform became insistent, and constitutional prohibitions were enacted to limit the practice of enacting special legislation and to achieve greater universality and uniformity in the operation of statute law in respect to all persons. [Id.]

██ In seeking to decide whether any particular legislation is general or special, the initial inquiry must be to determine the purpose of the enactment and the subject matter with which it is concerned. *Alfred Vail Mutual Ass'n. v. Borough of New Shrewsbury*, 58 *N. J.* 40, 48–49 (1971); *see also Roe v. Kervick*, 42 *N. J.* 191, 233 (1964). While this may sometimes be difficult, it is not so here. The purpose of *L.* 1974, *c.* 57 was simply and solely to adjust judi-

cial salaries. This was the one and only object of the act.[2] Although it dealt with the salaries of most members of the state judicary, we are here concerned only with its application to salaries of Associate Justices of the Supreme Court.

This having been determined, it is next appropriate to inquire whether there are persons similarly situated to those embraced within the act, who, by the terms of the act, are excluded from its operation. The persons, relevant to this inquiry, who are embraced within the act are the Associate Justices of the Supreme Court, presently five in number, each of whose annual salary by the terms of the statute was increased $3,000. Excluded by the terms of the act (Section 8) is any member of the Legislature who might succeed to the vacant position on the Court. For a prescribed period of time any such legislator-appointee, having become an Associate Justice, would not receive this increment. There would thus be five Associate Justices each receiving $3,000 more in annual salary than would the sixth. Unless this classification can somehow be sustained, the attack on the statute must succeed. The test, of course, is whether the classification is reasonable, not arbitrary, and can be said to rest upon some rational basis justifying the distinction. *Budd v. Hancock,* 66 *N. J. L.* 133, 135 (Sup. Ct. 1901); *Woodruff v. Freeholders of Passaic,* 42 *N. J. L.* 533, 535 (Sup. Ct. 1880); *cf. Skinner v. Collector,* 42 *N. J. L.* 407, 412 (Sup. Ct. 1880).

There has been excluded from the class of persons to whom the act applies, one who, *as a member of the Court,*

---

[2]It should at this point be recalled that under our Constitution no legislative enactment may pertain to more than one object. The constitutional provision reads as follows:

To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, *every law shall embrace but one object, and that shall be expressed in the title.* This paragraph shall not invalidate any law adopting or enacting a compilation, consolidation, revision, or rearrangement of all or parts of the statutory law. [*N. J. Const.,* Art. 4, § 7, ¶ 4; emphasis added]

would differ in no significant respect from the other five Associate Justices. It would be fatuous to suggest that distinctions exist among the Associate Justices of the Court such as to justify a salary differential. All perform the same tasks and share the same responsibilities. Indeed no argument has been offered to support any such distinction. It clearly does not exist. Hence we must conclude that the classification which results from an application of the statute is arbitrary. *See Batistich v. Brennan,* 45 *N. J.* 533, 535–36 (1965); *cf. Epstein v. Long,* 133 *N. J. Super.* 590, 599–600 (Law Div. 1975).

A further point merits comment. It has been argued that the classification created by Section 8 should be sustained as valid because the Legislature was there seeking, as to its then membership, to avoid the effect of the ineligibility provision of the Constitution, N. J. Const., Art. 4, § 5, ¶ 1, discussed at length in Part II of this opinion, and that this purpose would sustain a valid classification. Assuming this to have been the legislative intent, which may or may not have been the case, it in no way can be said to create a valid classification within the framework of this legislation.

It was noted above that this statute is concerned only with *judicial salaries.* Its effect, therefore, and hence its validity or invalidity, is to be gauged only as its impact may be observed *after,* not before, a legislator-appointee qualifies as a member of the Court and as such becomes entitled to receive a judicial salary.

Plaintiffs argue that the classification suggested above would in itself be invalid since it must have had as its aim the improper avoidance of a constitutional prohibition. We need not and do not express any opinion upon this point since, as we have seen, it is irrelevant. We look only to the effect produced by the statute upon the salary structure of the members of the Supreme Court.

Briefly restated, the method of analysis is this: we first discern the purpose and object of the enactment.

We then undertake to apply it to the factual situation presented. Finally we decide whether, *as so applied,* the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act. Since, in this case, it quite obviously cannot, we reach the conclusion that the statute constitutes special legislation.

■ ■ This result will be seen to emanate from the inclusion of *N. J. S. A.* 2A:1A–8 in the salary adjustment act. Believing that the legislative intent will be more nearly realized by exscinding this provision than by declaring the entire statute unconstitutional, we direct that this familiar technique of partial excision be employed. *State v. DeSantis,* 65 *N. J.* 462, 472–74, and authorities there cited. The foregoing provision, *N. J. S. A.* 2A:1A–8 will henceforth be deemed deleted from the statute. This results in a decision that the nomination is invalid, and that the judgment of the trial court must, upon this ground, be affirmed.

## II

Although our decision rests upon the determination of the majority as set forth in Part I of this opinion, we consider it advisable, because of the singular nature and undoubted importance of this case, to discuss the issue upon which the trial court rested its opinion and judgment. This issue is, were *N. J. S. A.* 2A:1A–8 deemed not to be special legislation, could the nomination be supported? Justice Clifford and Judge Carton join the writer of this opinion in the belief that it could not.

A great American jurist once said that "[i]t is sometimes more important to emphasize the obvious than to elucidate the obscure."[3] We believe that to be true here. It is vitally necessary that we not permit the unusual nature of this case to obscure its essential simplicity.

---

[3]Attributed to Justice Holmes. See *Dickerson, The Interpretation and Application of Statutes,* (1975) 7.

The pertinent constitutional provision with which we are here concerned, Art. 4, § 5, ¶ 1, which is quoted above, is not in our view in any sense ambiguous. To us it is devoid of any trace of uncertainty. It limits the eligibility of a member of the Legislature as candidate for "any State civil office or position, of profit," "during the term for which he shall have been elected."

The limitation is of a dual nature. The legislator, during the proscribed period, shall neither be "nominated, elected or appointed" to any "civil office or position" which shall either (1) "have been created by law," or (2) "the emoluments whereof shall have been increased by law" during the term for which he shall have been elected. He remains eligible, during his legislative term, as a candidate for any office or position that does not fall within either of the two forbidden categories. He regains his eligibility with respect to the two proscribed categories of office upon the expiration of the legislative term for which he shall have been elected.

It is a familar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in our State Constitution the language is the voice of the people. As this Court said some twenty years ago,

[T]he Constitution derives its force, not from the Convention which framed it, but from the people who ratified it; and the intent to be arrived at is that of the people.

\*       \*       \*       \*       \*       \*       \*       \*

The Constitution was written ."to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning"; and "where the intention is clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 *U. S.* 716, 51 *S. Ct.* 220, 75 *L. Ed.* 640 (1931) [*Gangemi v. Berry*, 25 *N. J.* 1, 16 (1957)]

With these thoughts in mind, let us examine the facts before us. During the four-year term for which Senator Wiley was elected to the Senate, the salary of Associate

Justice of the Supreme Court — the civil office or position to which he has now been nominated — was increased by act. of the Legislature, of which he was then a member, by the sum of $3,000. All appear to concede that had the matter stopped there, all members of the then State Legislature — including Senator Wiley — would have been automatically disqualified from this judicial appointment during the balance of their legislative terms.

This brings us to a consideration of *N. J. S. A.* 2A:1A–8, the section of the salary statute, twice quoted above, which is said to permit the presently pending appointment. We take this provision to say that should a member of the Legislature which passed the salary-increase statute be appointed to any of the positions to which the increase applies, he would not receive the increase "during the term for which he shall have been elected."

The word "term" as used in this statutory phrase clearly means term of office as legislator. Thus upon appointment to the office the legislator-appointee would not enjoy the salary increase during the balance of the legislative term for which he had been elected. In the case of Senator Wiley, this period would extend from the day the oath of office as an Associate Justice of the Supreme Court was administered until January 10, 1978, when the term for which he was elected Senator will expire. After that, for the balance of his seven-year term as Associate Justice, he *would* receive the salary increase.[3A]

---

[3A]What we have said in this paragraph applies if Section 8 of the statute is read as it is now written. We take note that our dissenting colleagues would delete from this section what they · refer to as the "limitation" clause, which reads "during the term for which he shall have been elected," (pp. 309, 331–333). The result of such deletion would be to deny to a legislator-appointee for an indefinite period of time and perhaps forever, the $3,000 salary increment that his colleagues on the Court would be meanwhile enjoying. With all due respect to our dissenting brethren, we would view this result as accentuating, rather than diminishing, the "special" quality of this legislation.

We cannot read Art. 4, § 5, ¶ 1 to permit this. Nothing in the Article limits the disqualifying increase in emolument to those that might otherwise be enjoyed during the balance of the legislator-appointee's legislative term of office. No statement to that effect forms any part of the provision.

As the Article is worded, the phrase "the term for which he [legislator] shall have been elected" is significant in two respects and in no other. It fixes and limits the time span within which legislative action must be taken if it is to be inhibiting, and similarly fixes and limits the time span during which the resulting ineligibility shall persist. It is relevant in no other way; it is used in no other sense. Specifically, it is clearly *not* related to the time of receipt or non-receipt of an increase in emoluments.

In considering the meaning of this Article, an important principle of constitutional interpretation should not be overlooked. Not all constitutional provisions are of equal majesty. Justice Holmes once referred to the "great ordinances of the Constitution."[4] Within this category would be included the due process clause, the equal protection clause, the free speech clause, all or most of the other sections of the Bill of Rights, as well as certain other provisions. The task of interpreting most if not all of these "great ordinances" is an evolving and on-going process. The history of the Federal Constitution clearly teaches that what may, for instance, be due process in one decade or in one generation will fail to meet this test in the next. And this is as it should be. The "great ordinances" are flexible pronouncements constantly evolving responsively to the felt needs of the times.

But there are other articles in the Constitution of a different and less exalted quality. Such provisions generally set forth — rather simply — those details of governmental ad-

---

[4] *Springer v. Philippine Islands*, 277 *U. S.* 189, 209, 48 *S. Ct.* 480, 72 *L. Ed.* 845, 852 (1928).

ministration as are deemed worthy of a place in the organic document. Examples from our own Constitution might be the clause in Art. 4, §4 ¶6 that requires bills and joint resolutions to be read three times in each house before final passage; or the provision in Art. 4, §5, ¶3 declaring that upon a member of the Legislature becoming a member of Congress, his seat in the Legislature shall thereupon become vacant; or the requirement set forth in Art. 5, §1, ¶2 that the Governor shall be not less than thirty years of age.

Such constitutional provisions as these, and others like them, important as they doubtless may be, are entirely set apart from the "great ordinances" mentioned above, and as matter of constitutional interpretation should receive entirely different treatment. Where in the one case the underlying spirit, intent and purpose of the Article must be sought and applied as it may have relevance to the problems of the day, in the other a literal adherence to the words of the clause is the only way that the expressed will of the people can be assured fulfillment.

We submit that the ineligibility clause quite definitely and clearly falls into this latter category. It announces no principle of government; rather it touches upon the mechanics and administration of government, much as in the examples set forth above. Provisions such as this should be read literally. No process of "interpretation" is necessary or appropriate. Only in this way can the plainly-expressed will of the people be carried out.

The clarity with which the ineligibility clause is expressed in both Federal and State Constitutions may be, in part at least, responsible for the fact that neither the Supreme Court of the United States nor this Court has ever hitherto been called upon to construe it.[5]

---

[5] In *Ex Parte Levitt*, 302 *U. S.* 633, 58 *S. Ct.* 1, 82 *L. Ed.* 493 (1937) the appointment of Hugo L. Black to be an Associate Justice of the Supreme Court was challenged on the ground that during his term of office as United States Senator a statute had been

It is a matter of general agreement that the "ineligibility" clause in our State Constitution derives directly from the similar provision in the Constitution of the United States, viz, Art. 1, § 6, clause 2, and that the latter was the result of one of the several compromises that characterized the work of the Convention of 1787. A brief word as to how this compromise evolved may be pertinent.

Certain delegates, led by Edmund Randolph of Virginia,[6] generally fearful of too expansive Federal power, urged that no member of Congress should be eligible for appointment to *any* state or federal office during the term for which he should have been elected and for one year thereafter. Other

---

enacted which increased, arguably at least, the emoluments of this office. The Court dismissed the action because of petitioner's lack of standing. Although not mentioned in the opinion, an alternate ground for dismissal rested in the fact that the Court was clearly without jurisdiction to hear the matter. Petitioner was seeking to invoke the original jurisdiction of the Supreme Court. Ever since *Marbury v. Madison*, 1 *Cranch* 137, 2 *L. Ed.* 60 (1803), it has been settled that the Supreme Court has only such *original* jurisdiction as was allocated to it under Art. 3, § 2 of the Constitution. This clause reads, in pertinent part,

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the Supreme Court shall have original Jurisdiction.

*Marbury* held that an act of Congress purporting to enlarge the original jurisdiction of the Supreme Court beyond the scope of Art. 3, § 2, was unconstitutional. *See* 3 *Beveridge, The Life of John Marshall* (1919) 101–156. The Courts unusual silence upon this point has not gone unnoticed. Witness the following comment directed to *Ex Parte Levitt*:

It seems curious that the Court, in rejecting petitioner's application, did not point out 'that it was being asked to assume original jurisdiction contrary to the decision in *Marbury v. Madison*, 1 *Cr.* 137, 58 S. Ct. 1 (1803) [*The Constitution of the United States: Analysis and Interpretation* (Corwin ed. 1953) 101]

A decision which failed to reach the merits, in which petitioner lacked standing and the Court lacked jurisdiction, has obviously no precedential value as to the attitude of the Supreme Court with respect to the ineligibility clause.

[6]Randolph was one of five delegates who in the end declined to sign the Constitution.

delegates, including Alexander Hamilton, were opposed to any disqualification whatsoever. They feared that imposing any kind of ineligibility would result in able men being unavailable for .public office. James Madison proposed the compromise arrangement that was substantially adopted. There should be no disqualification, he suggested, except in two respects: during the term for which he should have been elected no member of Congress might be appointed to "any civil office under the Authority of the United States" (1) "which shall have been created," or (2). "the. Emoluments whereof shall have been .encreased" during such term.

The debate on this issue in the Convention held in Trenton which produced our State Constitution of 1844 followed the same lines and resulted in a substantially identical provision. The Constitutional Convention of 1947 adopted the Article from the Constitution of 1844 with only a few changes in wording not here significant.

There appear to be only three out-of-state cases in which the issue of eligibility has been raised under circumstances substantially similar to those before us. In each case a statute providing for a salary increase stipulated that it should not apply to a legislator-appointee during the balance of his legislative term. · That is, of course, the same situation we have here. In each case the court found the appointment to be in violation of the state constitution. *Anderson v. Chapman,* 86 *Wash.* 2d 184, 543 *P.* 2d 229 (1975); *State ex rel. Fraser v. Gay,* 158 *Fla.* 465, 28 *So.* 2d 901 (1947); *State ex rel. Hawthorne v. Wiseheart,* 158 *Fla.* 267, 28 *So.* 2d 589 (1946).

The members of the Court mentioned above would therefore hold, as did the trial judge, that the nomination contravenes *N. J. Const.,* Art. 4, §5, ¶1.

SULLIVAN, J. (concurring). I am in complete agreement with Part I of the majority opinion which holds that the provision in the statute increasing judicial salaries which purports to exclude a legislator, during the term for which

he was elected, from the salary increase should he be appointed to judicial office during such term, is a class of special legislation interdicted by *N. J. Const.*, Art. IV, §7, par. 9(5). Once this provision falls, the Wiley nomination runs afoul of *N. J. Const.*, Art. IV, §5, par. 1 which, *inter alia*, prohibits any legislator during the term for which he was elected, from being nominated to a judgeship the emoluments of which have been increased during such term.

Since the Wiley nomination is invalid on this ground, I find it unnecessary to consider, were the statutory provision held *not* to be unconstitutional special legislation, whether the nomination would still be in violation of Art. IV, § 5, par. 1.

It may well be that in today's economic climate, with its persistent inflationary trends resulting in the constant erosion of the purchasing power of the salary dollar, Art. IV, § 5, par. 1 should be reconsidered at least insofar as it concerns salary increases which merely reflect economic conditions. There is considerable merit to the position that a cost of living increase enacted during a legislator's term ought not bar him from nomination or appointment during such term to an office affected by such increase. However, this would require a substantial modification of the constitutional provision, a matter beyond the province of this Court.

HUGHES, C. J., dissenting. The Court today invalidates the appointment by the Governor, confirmed by the Senate, of an Associate Justice of the Supreme Court of New Jersey. It thus overthrows an action of the executive and legislative branches of government. I consider that course wholly unnecessary and constitutionally unwarranted and intrusive and I respectfully dissent from the judgment of the Court.

The facts and procedural background are well and adequately stated in the opinion of the majority. To it might only be added a reference to the agreement of the senatorial plaintiffs that the appointment, *per se,* is unexceptionable in

its quality, from the standpoint of the ability of mind and integrity of character of the appointee.[1] Only the *caveat* to its constitutionality is advanced in derogation of the appointment. Hence the presumptive regularity of the challenged appointment is magnified by that factual concession of its intrinsic propriety, leaving in residue only the question of its constitutionality. This important point, implicating the separation of powers which is inherent in our system of government,[2] invokes the most careful and circumspect scrutiny.

Proceeding to the examination of that question, I first note the constitutional and statutory provisions upon which the trial court rested its decision invalidating the appointment of Senator Stephen B. Wiley to be a member of this Court. The 1974 statute increasing the salaries of all members of the state judiciary to meet inflationary pressures included the following provision:

> The increases in salary provided for in this act shall not be applicable to any present member of the Senate or General Assembly *during the term for which he shall have been elected* should such member hereafter be appointed to any of the offices enumerated in section 1 of this act. [*N. J. S. A.* 2A:1A–8 (emphasis added)].

By this latter provision the Legislature obviously intended to comply with the Constitution by avoiding any

---

[1] Counsel for Senator Vreeland and his colleagues state in their brief, at page 3:

These plaintiffs do not question Senator Wiley's integrity, intelligence, legal ability or any other necessary qualification for the position of Associate Justice of the Supreme Court. The sole basis of their complaint is that the nomination of Senator Wiley contravenes Article IV, Section V, Paragraph 1, of the New Jersey Constitution.

[2] Article III, par. 1 of the New Jersey Constitution of 1947 provides:

The powers of the government shall be divided among three distinct branches, the legislative, executive and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

disqualification of its then members for judicial office which would otherwise be required by Article IV, § V., par. 1 of the New Jersey Constitution of 1947, which provides in pertinent part:

No member of the Senate or General Assembly, during the term for which he shall have been elected, shall be nominated, elected or appointed to any State civil office or position, of profit, which shall have been created by law, or the emoluments whereof shall have been increased by law, during such term.

For convenience and brevity, I shall refer to the above constitutional provision as the "ineligibility" clause; to the statute section mentioned as the "exclusion" clause; and to the underlined statutory words — "during the term for which he shall have been elected" (I shall shorten this to "during his legislative term") — as the "limitation" clause.

The questions here presented involve the meaning and purpose of the "ineligibility" clause of the Constitution and whether the enactment of the "exclusion" clause amounts to an unconstitutional attempt to circumvent that meaning and purpose, or whether it represents legitimate legislative action faithful to the constitutional mandate.

The cornerstone of our state government is our state Constitution. All state governmental action whether it be executive, legislative or judicial must conform to this organic law. Even though governmental action is generally clothed with a presumption of legality, the judiciary, which is the final arbiter of what the Constitution means, must strike down governmental action which offends a constitutional provision.

To ascertain the true meaning of a particular constitutional provision it often becomes necessary to look beyond the particular words used. The polestar of constitutional construction is the intent and purpose of the particular provision. The function of the judiciary "is to give effect to the intent of the people in adopting" that particular provision. *Gangemi v. Berry*, 25 *N. J.* 1, 10 (1957). To

that end resort to pertinent constitutional history often serves as a valuable "aid in ascertaining the true sense and meaning of the language used." *Lloyd v. Vermeulen,* 22 *N. J.* 200, 206 (1956).

It has been said that if a constitutional or statutory provision is plain and unambiguous on its face, there is no room for construction and plain language must be given full effect without looking beyond the instrument. *Gangemi v. Berry, supra.* But that general rule has its limitations.[3] Even though on its face language may appear to be clear and unambiguous, if in fact, upon examination, the true intent and purpose of the Framers and the people appear, then the language should be read and applied in accordance with such intent and purpose. The United States Supreme Court in *United States v. American Trucking Ass'ns,* 310 *U. S.* 534, 543–44, 60 *S. Ct.* 1059, 1064, 84 *L. Ed.* 1345, 1351 (1940), held that:

When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which

---

[3]As stated by Justice Frankfurter:
Anything that is written may present a problem of meaning, and that is the essence of the business of judges in construing legislation. The problem derives from the very nature of words. They are symbols of meaning. But unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. ["Some Reflections on the Reading of Statutes," 47 *Colum. L. Rev.* 527, 528 (1947)].
*See generally* 3 *Sutherland, Statutory Construction,* "Legal Commentary for Part V. Statutory Interpretation" 407 (C. Sands 4th ed. 1974) ; Jones, "The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes," 25 *Wash. U. L. Q.* 2 (1939) ; Murphy, "Old Maxims Never Die: The 'Plain-Meaning Rule' and Statutory Interpretation in the 'Modern' Federal Courts," 75 *Colum. L. Rev.* 1299 (1975) ; Nutting, "The Relevance of Legislative Intention Established by Extrinsic Evidence," 20 *B. U. L. Rev.* 601 (1940) ; Note, "Extrinsic Aids to Statutory Interpretation — The New Jersey View," 8 *Rutgers L. Rev.* 486 (1954). Although these discussions of the "plain meaning rule" have generally referred to statutory construction, they are also appropriate in the context of constitutional interpretation.

forbids its use, however clear the words may appear on "superficial examination." (footnotes omitted).

So it is that the court sometimes rejects a "literal and grammatical" reading of the state Constitution for the reason noted by Justice Jacobs in *Lloyd v. Vermeulen, supra,* 22 *N. J.* at 206:

[S]ince words are inexact tools at best, resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used.

*See also Richman v. Ligham,* 22 *N. J.* 40, 44–52 (1956).

Although referring to statutory construction, the following statement of Justice Heher also notes the danger in assuming that the natural conveyance of words alone best demonstrates their intended meaning:

It is not "the words of the law, but the internal sense of it that makes the law." *Eyston v. Studd,* 2 *Plowd.* 459, 75 *Eng. Rep.* 695 (1574). * * * The intention emerges from the spirit and policy of the statute rather than the literal sense of particular terms. [*Caputo v. The Best Foods, Inc.,* 17 *N. J.* 259, 264 (1955)].

Furthermore, one may question whether the "ineligibility" clause is so clear and unambiguous that construction is unnecessary. Almost half of the states have constitutional provisions similar to that clause, and these provisions have generated a surfeit of litigation, with court decisions divided as to the true meaning of the particular provisions. And so it is that other courts have found it helpful to look at the abundant history surrounding ineligibility clauses similar to ours. *See, e. g., Meredith v. Kauffman,* 293 *Ky.* 395, 169 *S. W.* 2d 37, 38–39 (1943) ; *Mayor and Comm'rs v. Green,* 144 *Md.* 85, 124 *A.* 403, 404 (1923) ; *Spears v. Davis,* 398 *S. W.* 2d 921, 923, 929 (Tex. 1966) ; *Shields v. Toronto,* 16 *Utah* 2d 61, 395 *P.* 2d 829, 830 (1964).

Judicial consideration of problems arising from the "ineligibility" clause has not been so sparse as suggested by

the majority. An example of the inability of many courts construing such clauses to agree upon their interpretation and resulting application, may be noted in the exhaustive list of cases compiled by the court in *Warwick v. State ex rel. Chance,* 548 *P.* 2d 384, 389 n. 17 (Alaska 1976).[4]

---

[4]*Compare* cases upholding eligibility for office despite such a provision, *Opinion of the Justices,* 279 *Ala.* 38, 181 *So.* 2d 105 (1964) ; *State v. Myers,* 89 *Ariz.* 167, 359 *P.* 2d 757 (1961) ; *Carter v. Commission on Qualifications of Judicial Appointments,* 14 *Cal.* 2d 179, 93 *P.* 2d 140 (1939) ; *Adams v. Mathews,* 156 *So.* 2d 515 (Fla. 1963) ; *In re Advisory Opinion to the Governor,* 132 *So.* 2d 1 (Fla. 1961) ; *State ex rel. West v. Gray,* 74 *So.* 2d 114 (Fla. 1954) ; *State ex rel. Hawthorne v. Wiseheart,* 158 *Fla.* 267, 28 *So.* 2d 589 (1946) ; *State ex rel. Landis v. Futch,* 122 *Fla.* 837, 165 *So.* 907 (1936) ; *Sheffield v. State School Bldg. Auth.,* 208 *Ga.* 575, 68 *S. E.* 2d 590 (1952) ; *Bulgo v. Enomoto,* 50 *Haw.* 61, 430 *P.* 2d 327 (1967) ; *State v. Gooding,* 22 *Idaho* 128, 124 *P.* 791 (1912) ; *Redmond v. Carter,* 247 *N. W.* 2d 268 (Iowa 1976) ; *Meredith v. Kauffman, supra; State Tax Comm'n v. Harrington,* 126 *Md.* 157, 94 *A.* 537 (1915) ; *Mayor and Comm'rs v. Green, supra; State ex rel. Benson v. Schmahl,* 125 *Minn.* 104, 145 *N. W.* 794 (1914) ; *State ex rel. Olson v. Scott,* 105 *Minn.* 513, 117 *N. W.* 1044 (1908) ; *State ex rel. Lyons v. Guy,* 107 *N. W.* 2d 211 (N. D. 1961) *; Baird v. Lefor,* 52 *N. D.* 155, 201 *N. W.* 997 (1924) ; *State ex rel. Herbert v. Ferguson,* 142 *Ohio St.* 496, 52 *N. E.* 2d 980 (1944) ; *Gragg v. Dudley,* 143 *Okl.* 281, 289 *P.* 254 (1930) ; *State ex rel. Grigsby v. Osteroot,* 75 *S. D.* 319, 64 *N. W.* 2d 62 (1954) ; *Spears v. Davis, supra; Kothmann v. Daniels,* 397 *S. W.* 2d 940 (Tex. Civ. App. 1965) ; *Shields v. Toronto, supra; State ex rel. O'Connell v. Dubuque,* 68 *Wash.* 2d 553, 413 *P.* 2d 972 (1966), overruling *State ex rel. Pennick v. Hall,* 26 *Wash.* 2d 172, 173 *P.* 2d 153 (1946) ; *State ex rel. Hamblen v. Yelle,* 29 *Wash.* 2d 68, 185 *P.* 2d 723 (1947) ; *State ex rel. Todd v. Reeves,* 196 *Wash.* 145, 82 *P.* 2d 173 (1938) ; *State ex rel. Johnson v. Nye,* 148 *Wis.* 659, 135 *N. W.* 126 (1912) ; *State ex rel. Ryan v. Boyd,* 21 *Wis.* 208 (1866) ; *Brimmer v. Thomson,* 521 *P.* 2d 574 (Wyo. 1974), *with* cases holding that the constitutional bar prohibited the person from taking office, *Opinion of the Justices,* 244 *Ala.* 386, 13 *So.* 2d 674 (1943) ; *Montgomery v. State ex rel. Enslen,* 107 *Ala.* 372, 18 *So.* 157 (1895) ; *Kederick v. Heintzleman,* 132 *F. Supp.* 582 (D. Alaska 1955) ; *In re Advisory Opinion to the Governor,* 225 *So.* 2d 512 (Fla. 1969) ; *Advisory Opinion to Governor,* 156 *Fla.* 55, 22 *So.* 2d 458 (1945) ; *Taylor v. Commonwealth ex rel. Dummit,* 305 *Ky.* 75, 202 *S. W.* 2d 992 (1947) ; *Kimble v. Bender,* 73 *Md.* 608, 196 *A.* 409 (1938) ; *Opinion of the Justices,* 348 *Mass.* 803, 202 *N. E.* 2d 234 (1964) ; *In re Opinion of the Justices,* 303 *Mass.* 615,

Such "ineligibility" provisions, including our own which first appeared in our Constitution of 1844, were modeled after Art. I, § 6, clause 2 of the United States Constitution, which provides:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

This clause was the subject of much debate at the Federal Convention of 1787. As originally proposed, the clause would have made Senators and Representatives ineligible for appointment to any office, state or national, during their term of office and for a period of time thereafter. *See* I *M. Farrand, The Records of the Federal Convention of 1787,* at 20–21 (1911). The primary reason for the exclusion was to eliminate, to the extent possible, any bias or consideration of self-interest in the vote of a legislator. II *J. Story, Commentaries on the Constitution of the United States* § 864, at 330–31 (1833). However, there were those who believed that such an exclusion would disqualify some of the country's ablest figures from any other public office simply because they were participant legislators, and at the least

---

21 *N. E.* 2d 551 (1939) ; *Fyfe v. Mosher,* 149 *Mich.* 349, 112 *N. W.* 725 (1907) ; *Miller v. Holm,* 217 *Minn.* 166, 14 *N. W.* 2d 99 (1944) ; *State ex rel. Anderson v. Erickson,* 180 *Minn.* 246, 230 *N. W.* 637 (1930) ; *State ex rel. Childs v. Sutton,* 63 *Minn.* 147, 65 *N. W.* 262 (1895) ; *Shelby v. Alcorn,* 36 *Miss.* 273, 72 *Am. Dec.* 169 (1858) ; *Baskin v. State ex rel. Short,* 107 *Okl.* 272, 232 *P.* 388 (1925) ; *Palmer v. State,* 11 *S. D.* 78, 75 *N. W.* 818 (1898) ; *Hall v. Baum,* 452 *S. W.* 2d 699 (Tex. 1970), appeal dismissed, 397 *U. S.* 93, 90 *S. Ct.* 818, 25 *L. Ed.* 2d 79 (1970) ; *Romney v. Barlow,* 24 *Utah* 2d 226, 469 *P.* 2d 497 (1970) ; *State ex rel. Jugler v. Grover,* 102 *Utah* 41, 125 *P.* 2d 807, (1942) ; *State ex rel. Anderson v. Chapman,* 86 *Wash.* 2d 189, 543 *P.* 2d 229 (1975) ; *Oceanographic Comm'n v. O'Brien,* 74 *Wash.* 2d 904, 447 *P.* 2d 707 (1968) ; *State ex rel. French v. Clausen,* 107 *Wash.* 667, 182 *P.* 610 (1919).

might discourage many talented persons from seeking legislative office.

Delegate Roger Sherman, seeking to prevent the abuse of the appointive power which had existed in England, advocated a total disqualification of legislators from seeking other offices. II *Farrand, supra,* at 490. Among the federal delegates arguing in favor of eligibility was Nathaniel Gorham of Massachusetts, who sought to strike the clause's application to legislators holding federal office. *See* Pollitt, "Senator/Attorney-General Saxbe and the 'Ineligibility Clause' of the Constitution: An Encroachment Upon Separation of Powers," 53 *N. C. L. Rev.* 111, 114 (1974). He was supported by James Wilson of Pennsylvania, who argued that " '[s]trong reasons must induce me to disqualify a good man from office.' " *Id.* (On the state level the same concerns were expressed by delegate Alexander Wurts, who, among others, argued that the constitutional changes removing unchecked appointive power from the Legislature alleviated the necessity of an absolute bar to appointment of legislators. *Proceedings of the New Jersey State Constitutional Convention of 1844,* at 306 (Bebout ed. 1942) [hereafter cited as *1844 Proceedings*]. Particular concern was expressed as to the availability of legislators for judicial office appointment.[5])

The clause as finally adopted in the United States Constitution represents a compromise proposed by James Madison that the "disqualification only apply to federal offices created during the legislator's term or those of which the emoluments had been increased during such term." I *Far-*

---

[5]"[I]f you restrict the members of the Legislature from all appointments, the state may suffer great injury. Suppose the office of Chancellor should become vacant, and the very man on whom all eyes were fixed as the one most competent and proper to fill it should be in the Senate. The Governor cannot look to either House to fill the office, and the state must suffer. The same effect would be produced if a vacancy should occur in the office of Chief Justice or Associate Justice of the Supreme Court." [*1844 Proceedings* at 306].

*rand, supra,* at 386. This middle ground permitted members of the Senate and House of Representatives, during the time for which they were elected, to be appointed to other offices so long as such offices had not been created or their benefits enhanced during the appointee's legislative term. Even as to offices which had been created or the emoluments of which had been increased, the disqualification ended upon expiration of the legislator's term.

Controversy surrounding the "ineligibility" clause which first appeared in our 1844 Constitution was not unlike that of the Federal debates. One proposal to bar any member of the Legislature, during the term for which he was elected, from appointment to any other office was advocated as a means of eliminating any possible self-interest or collusion. This was rejected on the ground that its sweep was much too broad and that the most competent and experienced persons would thus be precluded from appointment, to the detriment of the State.[6]

The 1844 Convention ultimately adopted a proposal similar to the compromise suggested by Madison in 1787 at the Federal Convention, which in effect barred a member of

---

[6]A final debate over total disqualification resulted in a vote of 32 to 16 to reject the provision totally disqualifying legislators from other offices. Records of the debate indicate that the framers of the 1844 Constitution carefully considered arguments that the need to prevent corruption or collusion outweighed the need to make qualified legislators available for other positions:

Mr. Ewing thought that the section did not go far enough, but that members of both Houses should be excluded from any appointments during their term and he moved to amend the same, by striking out all after the word "state" to the end of the section.

Mr. Ryerson and Mr. Child suggested that the most competent and the best men for offices which might become vacant might be in either House, and this amendment would preclude the Governor from selecting them, when they were, perhaps, the very best men for the station, and who had not any idea that any vacancy would exist, when they were elected.

Mr. Ewing again advocated the amendment, and urged that corruption or collusion which might arise on this subject, ought to be prevented. [*1844 Proceedings, supra,* at 518].

the Legislature during his term of office from appointment to another office only if such office had been created or its benefits enhanced during the appointee's legislative term. *1844 Proceedings, supra,* at 518. As approved, Art. IV, § V, par. 1 of the 1844 Constitution provided:

No member of the Senate or General Assembly shall, during the time for which he was elected, be nominated or appointed by the governor or by the legislature in joint-meeting, to any civil office under the authority of this state, which shall have been created or the emoluments whereof shall have been increased, during such time.

Proposals to broaden the "ineligibility" clause have been intermittent. *See Constitution of the State of New Jersey Proposed to be Amended by the Constitutional Commission 1873,* at 9; *Joint Legislative Committee Constituted Under Senate Con. Res. No. 19, Proposed (1942) Constitution of 1844, as amended,* at 12; *Proposed Revised Constitution of 1944,* Art. III, § 3, par. 3. However, the clause remained unchanged until adoption of the 1947 Constitution, although the controversy persisted even then. During the debates before the committee on legislation, arguments calling for a broader provision were rejected. *See* III *Constitutional Convention of 1947,* at 609, 702–05, 807, 851; II *id.* at 1064. As adopted, the present "ineligibility" clause is substantially identical to the 1844 provision.

While New Jersey courts, prior to the instant case, have not been called upon to interpret Art. IV, § V, par. 1, a situation somewhat analogous to the instant case arose in this State in 1892 when Governor Abbett appointed George T. Werts as an Associate Justice of the Supreme Court. Werts was a State Senator at the time and during his term an act increasing the salaries of Supreme Court Justices had been passed. (*L.* 1891, *c.* 274). In order to remove the constitutional bar to Werts' appointment a bill repealing the salary increase was passed by both houses. However, as the New Jersey Law Journal pointed out, the repealer applied only to Werts and had no effect on the salaries

of any of the justices then in office by virtue of Art. VII, § II, par. 1 of the Constitution (1844) which provided that the compensation of Justices of the Supreme Court "shall not be diminished during the term of their appointments." XV *N. J. L. J.* 95–96 (1892). The appointment was not challenged in the courts.

The foregoing history of the particular constitutional provision makes it clear that its purpose and intent were not to prohibit a legislator's nomination to office. Disqualification exists only where the office was created during the legislator's term of office or the emoluments thereof increased by law during such term. Even then the disqualification from appointment is not absolute and only exists during the legislator's term of office.

Subsequent to such term his right to nomination or appointment is unquestioned, even though the office was created or its emoluments increased during the nominee's legislative term. The evil to which the constitutional provision is directed is legislative self-interest, *i. e.,* the possibility that a legislator might be influenced in voting for a newly-created office or for compensatory increase for an existing office if he were eligible to be appointed to that office during his legislative term. With respect to such motivations, where an appointment ensues after the end of the legislative term, the Constitution is indifferent thereto on its face. In other words the constitutional objective is that a legislator may not profit directly from his vote, because of a nomination occurring during his term. *N. J. S. A.* 2A:1A–8 was *intended* to accomplish exactly what the "ineligibility" clause requires. (See Senate Judicary Committee Statement accompanying the Committee amendments to *L.* 1974, *c.* 57.) Its purpose was to place self-enrichment, during the span of the legislative term, beyond the power of any member of the Legislature.

In Wiley's case the act increasing judicial salaries was passed during his term as State Senator and would ordinarily be regarded as an increase in the emoluments of the judi-

cial offices involved.[7] Yet, by the very provisions of the act, Wiley, having been appointed to judicial office, may not receive any part of the increase in judicial salary during the balance of his legislative term. As to him the emoluments of such offices have not been increased, at least for the period of the term for which he was elected. I do not consider this to be an unlawful act to circumvent the constitutional purpose. Rather I find that it was intended to be a legitimate legislative provision fully consistent with the "ineligibility" clause of the Constitution.

.The trial court believed that such provision amounted to an attempt to circumvent the constitutional "ineligibility" clause and, considered in aid of the appointment of Senator Wiley (or any other legislator appointed to the bench during the term for which elected) was itself, for that cause, unconstitutional and ineffective. I believe, on the contrary, that the statute is entitled to the highest judicial respect as a bona fide legislative attempt to comply with the Consitution. The effect of the statute in doing so is another matter.

I think it goes without saying that absent the "exclusion" clause of N. J. S. A. 2A:1A, since that legislation enacted a general increase in all judicial salaries within the state court system, the Wiley appointment would clearly be unconstitutional, as coming directly within the words and intendment of the "ineligibility" clause. It should be noted parenthetically that the "ineligibility" clause applies to any current legislator whether or not he voted for the statute increasing the emoluments of judicial office. From a consti-

---

[7] It has been suggested that an across-the-board increase in judicial salaries made in a period of continuing inflation is nothing more than a cost-of-living adjustment which only seeks to avoid the erosion of the purchasing power of the judicial salary and is not an increase in emoluments. In *Shields v. Toronto*, 16 *Utah* 2d 61, 395 *P.* 2d 829 (1964), the Supreme Court of Utah held that a modest across-the-board salary increase for state officers should be treated as a cost-of-living adjustment and not an increase in emoluments within the meaning of its constitutional provision.

tutional standpoint it is immaterial whether the legislator voted for the increase; his very membership in the actor Legislature is the disqualifying factor.

.Here analysis of the "ineligibility" clause is in order. I believe the expression "during the term for which he shall have been elected" in the "ineligibility" clause can be relevant only to two specific events: (1) the passage of a particular statute increasing emoluments of office, and (2) the appointment of a participant legislator to such office; that it concerns nothing else, including a limited period of disqualification of such appointee to receive the increased emoluments; so that, as well said by Justice Mountain for the majority, that part of the "ineligibility" clause is significant in only two respects, — "it is relevant in no other way; it is used in no other sense."

The argument is made that a participant legislator if appointed, let us say, immediately after the expiration of his legislative term (he having had previous knowledge that he would be so appointed) might validly enjoy increased emoluments voted in the very twilight of that term, perhaps with his strenuous support. There is a surface plausibility to the theory that his self-interest motivation in such case would be so evident (as distinguished from the instant case where a routine, "good government" type of judicial pay raise legislation was involved, causing the most coincidental and innocent subjection of a legislator-appointee to the stricture of the "ineligibility" clause) that the "limitation" clause depriving the latter of the increase "during his legislative term" might be enough to meet the constitutional norm. But the comparison of these two cases has no constitutional base, when one considers that in the case of the post-term appointment, as noted, the Constitution is wholly indifferent (II *J. Story, Commentaries on the Constitution of the United States* § 864, at 331 (1833); I *J. Tucker, The Constitution of the United States* 442-43 (1899) ) and was intended so to be. Otherwise the Framers would have proposed and the people adopted the proviso, strenuously but unsuc-

cessfully argued for at convention, that the debarment from appointment should be permanent, or at least for a period of one year after the expiration of the legislative term.

So, inevitably, emerges the question of the legal and constitutional effect of the clause disqualifying a legislator-appointee from the increase "during his legislative term." If this "limitation" clause is viable, the statute would seem to me to increase, albeit to be enjoyed at a later time, the emoluments of office. Thus the appointee will at some future time enjoy the fruits of the legislation in whose adoption he was participant in the above sense. He would be destined to occupy an office "the emoluments whereof [were] increased by law" during the constitutionally sensitive period of his legislative term, and for such reason he would be disqualified from that office.

Assuming that the constitutional defect clearly exists under the statute as it stands, the focal question is presented. Need the "limitation" segment of the "exclusion" clause be immovably viable, in the light of the primary purpose of the "exclusion" clause of the statute? While it does indeed represent the will of the Legislature, the larger legislative purpose was to qualify legislators for appointment to judicial office, notwithstanding the general salary increase. As has been said, that was a legitimate goal. There can be no doubt that such legislative intent was bona fide in its purpose to comply with the Constitution by avoiding the constitutional disqualification set forth in the "ineligibility" clause. In such case, must the vulnerable "limitation" provision necessarily doom the main thrust and purpose of section 8 of the statute?

The synthesis of American judicial thought from the earliest times in our history would, I suggest with all respect, indicate to the contrary. The partible nature of a constitutionally challenged legislative act was recognized in *Bank of Hamilton v. Lessee of Dudley*, 27 *U. S.* (2 Pet.) 492, 526, 7 *L. Ed.* 496, 508 (1829), in which Chief Justice Marshall stated:

If any part of the act be unconstitutional, the provisions of that part may be disregarded, while full effect will be given to such as are not repugnant to the Constitution * * *.

In 1881, the Supreme Court held:

[I]t seems to us that the unconstitutional part of the statute may be stricken out and the [unobjectionable provision] left in full force. The striking out is not necessarily by erasing words, but it may be by disregarding the unconstitutional provision, and reading the statute as if that provision was not there. [*Florida Cent. R. R. v. Schutte*, 103 *U. S.* 118, 142, 26 *L. Ed.* 327, 336 (1881)].

Judicial respect for the other branches of government has also been the rule in New Jersey. The former Court of Errors and Appeals held in *St. John the Baptist, &c., Church v. Gengor*, 121 *N. J. Eq.* 349, 357 (1937):

Where the principal object of the statute is constitutional, and the objectionable feature can be excised without substantial impairment of the general purpose, the statute is operative except in so far as it may contravene fundamental law.

This judicial diffidence in confronting an act of the Legislature, and the reasons for it, were emphasized long ago by Chief Justice Marshall, sitting at circuit in *Ex parte Randolph*, 20 *F. Cas.* 242, 254 (No. 11,558) (C. C. D. Va. 1833):

No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.

That judicial restraint is the rule as well in New Jersey. *Donadio v. Cunningham*, 58 *N. J.* 309, 325–26 (1971).

So it is that courts have confined themselves to measuring executive and legislative action (as their sworn duty to uphold the Constitution requires them to do) only on a constitutional and not a politic basis, never concerning themselves

with the wisdom, justification or even the sense or honesty of purpose of the act of the other branch of government. That is the business of the other branch.[8] It is the Constitution that is the business of the courts.

The courts consider constitutionally germane questions such as these: Has the Legislature exceeded its constitutional power (*Rothman v. Rothman,* 65 *N. J.* 219 (1974); *New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N. J.* 1, *appeal dismissed,* 409 *U. S.* 943, 93 *S. Ct.* 270, 34 *L. Ed.* 2d 215 (1972); *Burton v. Sills,* 53 *N. J.* 86 (1968), *appeal dismissed,* 394 *U. S.* 812, 89 *S. Ct.* 1486, 22 *L. Ed.* 2d 748 (1969))? Does the statute offend a constitutional provision or right (*King v. South Jersey Nat'l Bank,* 66 *N. J.* 161 (1974); *State v. Rosenfeld,* 62 *N. J.* 594 (1973); *West Morris Regional Bd. of Ed. v. Sills,* 58 *N. J.* 464, *cert.* den., 404 *U. S.* 986, 92 *S. Ct.* 450, 30 *L. Ed.* 2d 370 (1971))? Did the executive action contravene a statute, thus invading the constitutional prerogative of the Legislature (*Pascucci v. Vagott,* 71 *N. J.* 40 (1976))? Does the statute measure up to a plain constitutional imperative (*Robinson v. Cahill,* 69 *N. J.* 449 (1976); *State v. DeSantis,* 65 *N. J.* 462, 473 (1974); *State v. Madewell,* 63 *N. J.* 506, 513 (1973)), and the like. The courts thus are careful to act within their own constitutional sphere, showing respect to the prerogatives of the other branches of government and avoiding encroachment upon them in any way.

When it does become necessary to assess a statute from the standpoint of its constitutionality, our Court recalled, in *Roe v. Kervick,* 42 *N. J.* 191, 229 (1964), "the long-established principle of judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution [and] the equally-settled doctrine that the

---

[8] *Arant v. Clifford,* 67 *N. J.* 496, 517 n. 19 (1975); *New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N. J.* 1, 8, *appeal dismissed,* 409 *U. S.* 943, 93 *S. Ct.* 270, 34 *L. Ed.* 2d 215 (1972).

means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity."

Courts have many obligations including the interpretation of statutes, the application of common and statutory law, the doing of equity, the weighing of proofs as justifying trial judgment, the scrutiny of executive or administrative actions claimed to be arbitrary or illegal, and the like. None transcends (although all are involved in and spring from) the specific obligation of courts to uphold and enforce the Constitution.

And although this obligation is ineluctable in the end, it must be approached, as Chief Justice Marshall suggested, not wantonly or lightly but with utmost circumspection.

So it has been the constant thrust of judicial purpose and responsibility to respect legislative action in the adoption of laws, where they are conformable or, as will be seen, potentially conformable to the Constitution. The same respect is due executive action, whose purposeful decision here involved was amplified by the further legislative action of the Senate in confirming the appointment. The Court's decision here accomplishes a very grave governmental eventuality, that of nullification of the action of two other branches of government.

That such judicial power exists, as a constitutional responsibility, is unquestioned. *Marbury v. Madison*, 5 *U. S.* (1 Cranch) 137, 2 *L. Ed.* 60 (1803). The assumption of such responsibility by New Jersey courts is clear. *Moyant v. Paramus*, 30 *N. J.* 528 (1959); *Schmidt v. Newark Bd. of Adjustment*, 9 *N. J.* 405 (1952). Whether the power should be exercised is another matter. If there is no alternative consonant with the Constitution, of course it must be. But if such an alternative exists, so that there be no constitutional compulsion that the act of the Legislature be "wantonly assailed" (*Ex parte Randolph, supra*), then the Court, out of respect to the principle of separation of governmental powers, should take that alternative course. That separation of power, constitutionally enshrined, is basic to our form of

government, and ought to be scrupulously observed by courts, the final guardians of the Constitution.

Is there such an alternative here? Courts have sought and found such in innumerable instances. They have "strained" to uphold a legislative act. Justice (then Judge) Pashman stated in *New Jersey Sports & Exposition Auth. v. McCrane*, 119 *N. J. Super*. 457, 476 (Law Div. 1971), *aff'd*, 61 *N. J.* 1, *appeal dismissed*, 409 *U. S.* 943, 93 *S. Ct.* 270, 34 *L. Ed.* 2d 215 (1972), that "[t]he duty of the court is to strain if necessary to save the act, not to nullify it." The courts have performed "judicial surgery" such as in *State v. Zito*, 54 *N. J.* 206, 218 (1969), in which Chief Justice Weintraub said in another context for a unanimous Court:

The statute is an important instrument for protection of the individual, and since the Legislature would likely want the statute to remain to the extent that it may, we see no impediment to such judicial surgery as will bring the statute within the Constitution.

This manner of construction of a given statute, in order to conserve, within the permissible constitutional range, the clearly discerned legislative will, is therefore one of constitutionally and judicially encouraged respect for the Legislature as a co-equal branch of government. It is sometimes called "judicially salvag[ing]" a statute to meet constitutional requirements as in *State v. DeSantis, supra*, 65 *N. J.* at 472. At other times it is called "judicial pruning" as in *Borough of Collingswood v. Ringgold*, 66 *N. J.* 350, 357, 364 (1975), *appeal dismissed*, 426 *U. S.* 901, 96 *S. Ct.* 2220, 48 *L. Ed.* 2d 826 (1976), in which this Court "performed such judicial pruning as [to] render the ordinance constitutional," or "excision," referring to whatever infirmity in such ordinance as "might be exposed by judicial scrutiny, which defects we undertake to excise." The effort to preserve the legislative purpose is clear from the language of our Court in *Ringgold*, — "[w]e invalidate the ordinance as to [certain] provisions but find that the remaining requirements

are neither undue nor discriminatory, and that [so construed], the ordinance survives * * * ." *Id.* at 362.

It is for a similar judicial purpose and under like compulsion that the majority in the instant case feels free to excise from the statute the whole of the "exclusion" clause.

The same general principle applies in weighing the rigidity or flexibility of a constitutional interdiction. As stated by Justice Heher in *Behnke v. New Jersey Highway Auth.*, 13 *N. J.* 14, 25–26 (1953):

A constitutional interdiction against the exercise of a particular power is in the nature of an exception; and it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. The limitation upon the exercise of the legislative function must be clear and imperative. This constitutes a basic restraint upon the power of the courts, federal and state, to nullify a statute for want of constitutional congruity. * * *

While constitutional limitations are in their very nature inflexible in meaning and immune to varying public opinion, *social and economic needs arising from the complexities of modern life call for new applications of the principle; and the Constitution would not serve its essential purpose were it insensitive to the demands of a changing society and economy.* * * * The principle itself is unalterable except by the will of the people expressed in the constitutional mode, but accommodation to new needs without a violation of the essence of the principle does not contravene the intent of the instrument. We are concerned with the spirit of the limitation, and in that inquiry related provisions must be held in view. The true rule of construction "is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth." [quoting from *Downes v. Bidwell*, 182 *U. S.* 244, 312, 21 *S. Ct.* 770, 796–97, 45 *L. Ed.* 1088, 1116 (1901) (White, J., concurring) (emphasis added) (citations omitted)].

Similar respect, and the judicial restraint impelled by it, should be shown the Executive who makes an appointment, the Senate which confirms it, and the Legislature which enacts a law in its support.

Not only does the exercise of judicial restraint in general require that we follow these established precedents, to avert destruction of the solemn act of the Legislature and Executive, but the strongest public policy reasons dictate that course here as a constitutional imperative. First I must note a respectful *caveat* to the view that only the "great ordinances" of the Federal Constitution such as the due process and equal protection clause and matters enshrined in the Bill of Rights (or their counterparts in a state constitution) are subject to flexibility so as to evolve responsively to the changing needs of the times; and that all other constitutional provisions because they deal with the mechanics of government must be considered as so static, immovable or dead, in a sense, that as to them the Constitution could not serve its essential purpose by responding to the demands of a changing society and economy. *Home Building and Loan Association v. Blaisdell,* 290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413 (1934) ; *Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926), cited by Justice Heher for this Court in *Behnke v. New Jersey Highway Auth., supra.*

It must be remembered that "[a] state constitution, unlike the Federal Constitution, is not a grant but a limitation of legislative power." The function of the Legislature is to exercise a portion of the sovereign power residing in the first instance in the people, subject to limitations imposed by the Federal Constitution and our own, as well as those so fundamental in the social compact and the Anglo-Saxon principles of natural justice as to be necessarily implied; and in determining the operative scope of a constitutional limitation courts are enjoined "to collect the sense and meaning of the clause," the goal being to ascertain "the intent of the people in imposing the particular restraint." *Behnke v. New Jersey Highway Auth., supra,* 13 *N. J.* at 24.

In considering the flexibility in application of a constitutional provision then, including one thus interdictory

328

in nature, it is important to understand that it does not disparage, but is concordant with, the constitutional will of the people for their Constitution to be considered as a living charter,[9] — designed to serve the ages and to be adaptable to the developing problems of the times; and this without abandoning in any slightest way the fixed and age-

[9]To reach a fair and just constitutional interpretation, Chief Justice Marshall stressed that "we must never forget, that it is a *constitution* we are expounding." He argued that its provisions were "intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *M'Culloch v. Maryland*, 17 *U. S.* (4 Wheat.) 316, 407, 415, 4 *L. Ed.* 579, 601, 603 (1819).

The Constitution is a continually operating charter of government, *Yakus v. United States*, 321 *U. S.* 414, 424, 64 *S. Ct.* 660, 667, 88 *L. Ed.* 834, 848 (1944); *Hirabayashi v. United States*, 320 *U. S.* 81, 104, 63 *S. Ct.* 1375, 1387, 87 *L. Ed.* 1774, 1788 (1943); *Opp Cotton Mills, Inc. v. Administrator*, 312 *U. S.* 126, 145, 61 *S. Ct.* 524, 532, 85 *L. Ed.* 624, 636 (1941); and it has been pointed out that:

> The greatest expounders of the Constitution, from John Marshall to Oliver Wendell Holmes, have always insisted that the strength and vitality of the Constitution stem from the fact that its principles are adaptable to changing events. [*R. Jackson, The Struggle for Judicial Supremacy* 174 (1941)].

Justice Holmes observed in *Gompers v. United States*, 233 *U. S.* 604, 610, 34 *S. Ct.* 693, 695, 58 *L. Ed.* 1115, 1120 (1914) that

> the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth.

It was this sense of vitality and adaptability that caused the court to say in *New Jersey Sports & Exposition Auth. v. McCrane, supra*, 119 *N. J. Super.*, at 476:

> [I]t is no answer to say that this public need was not constitutionally envisioned 50 years ago. That Constitution, with which the law measures "public purposes," was created to endure for ages and was intended therefore to be adopted for the many crises of human affairs generated by changing social needs and the demands for sensitivity towards them.

And because the Constitution has such life it "states or ought to state not rules for the passing hour, but principles for an expanding future." *B. Cardozo, The Nature of the Judicial Process* 83 (1921).

less basic principles by which a free people agreed by constitution to be bound together in their government. The hopes and the intent of the people, as discerned by those whom they designated to judge, are paramount. It is in this sense that I would fulfill that judicial responsibility, so reposed in us by the constitutional will of the people.

And it is in this sense also, that I would believe that the constitutional "ineligibilty" clause, in the context of a statute so obviously intended to comply with it, should be considered according to the "spirit which vivifies, and not by the letter which killeth." This concept of constitutional adaptability and good sense application is particularly appropriate here, considering the relationship of the "ineligibility" clause to the current realities of government in New Jersey, as compared with those extant at the time of the clause's birth.

In this second half of the century in which we are living, the operation of the civil government created by our Constitution, because of inflation, has come to be dependent upon frequent, almost annual, "cost-of-living" increases in compensation for all State employees (although more rarely in the case of judges), a condition surely not extant in 1844, nor significantly so even in 1947.[10] These increases occur, of course, by law, supported by an appropriation bill. Unless civil government is to stop, then, the

---

[10]Although there were several war-related "bonuses and adjustments" enacted during the decade in which the 1947 Constitution was adopted, 1940–1950, there were no general, across-the-board, cost-of-living salary increases passed.

Compare that era with the decade of 1966–1976, where general, cost-of-living increases have become almost an annual event:

L. 1967, c. 63 — 5%
L. 1968, c. 119 — 5%
L. 1969, c. 71 — 5%
L. 1971, c. 240 — 6%
L. 1972, c. 73 — 2.18% (salary-range adjustment)
L. 1973, c. 188 — 5.50%
L. 1974, c. 58 — 6%
L. 1976, c. 42 — 7% (approximately)

literal interpretation and unconditional application of the "ineligibility" clause, under all circumstances, would realistically bring about the extreme result unsuccessfully sought by the Convention dissidents of 1844, namely the total exclusion of all legislators, during their term, from any appointive office, executive, administrative as well as judicial, to the clear disadvantage of the state. Yet this absurd result was surely not intended by the Framers of the Constitution nor the people who adopted it. As has been noted, James Madison argued that some of the ablest would be found in the Legislature and it would be a mistake to disqualify them from office. And this, not for the sake of the appointee, but for that of the government and commonweal. The senatorial plaintiffs in this case, as I have noted, concede the virtue and propriety of this appointment as concern the character and ability of the appointee, pointing only to the constitutional clause and its supposed inflexible and literal application, in derogation of the appointment. We are thus confronted here not so much with the fate of a specific appointee as with the interest of the State and its government, its judicial system and the plainly evinced legislative will, all inevitably concerned with the constitutional validity of this appointment.

Were it not for the "limitation" clause "during his legislative term," the effect of *N. J. S. A.* 2A:1A–8 would be to withhold entirely the benefit of generally increased emoluments from legislator-appointees, with the result that the "office" to which one of them would be appointed would not be an "office" whose emoluments were increased by law enacted during his legislative term. In such case, without the vulnerable "limitation" clause the joints of the "ineligibility" clause would have at least this much play[11] —

---

[11]"The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints." Oliver Wendell Holmes, J., *Bain Peanut Co. v. Pinson,* 282 *U. S.* 499, 501, 51 *S. Ct.* 228, 229, 75 *L. Ed.* 482, 491 (1931).

that the statutory withholding of emoluments from the "office" to which Wiley was appointed would negate in logic any idea that the compensation of that office was increased by law.

So clearly does it seem to me that the complicating and hurtful "limitation" clause would needlessly subvert the main legislative purpose of the statutory section quoted, that it should be considered as surplusage and be ignored, as was done in the many salutary precedents cited (including, as noted, the action of the majority of the Court in this very case in discarding the "exclusion" clause *in toto*). The result, in my opinion, would be to leave the appointment, in the light of the basic section 8 of the statute, so construed, perfectly valid in the constitutional sense.

Nor, so construed, should section 8, in my view, be considered to be a "special law" in violation of Article IV, § VII, par. 9 of the Constitution. It operates upon a readily identifiable and appropriately classified group, that is to say, all members of the New Jersey Legislature otherwise eligible for appointment to judicial office. All of such persons when appointed to any state judicial office are subject to the terms of section 8 of the statute. They must forego that part of their emoluments increased, as to all other members of the judiciary, by the statute. No one is excluded who should be included. This classification is not unreasonable or arbitrary, including all and excluding

"There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents [in prison disciplinary cases]." White, J., *Wolff v. McDonnell*, 418 *U. S.* 539, 567, 94 *S. Ct.* 2963, 2979–80, 41 *L. Ed.* 2d 935, 957 (1974).

"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, Kansas & Texas Railway Company of Texas v. May*, 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904), quoted by Justice Heher in *McCutcheon v. State Building Auth.*, 13 *N. J.* 46, 79 (1953).

none who are eligible for appointment to the bench. *See Budd v. Hancock,* 66 *N. J. L.* 133, 135 (Sup. Ct. 1901).

Nor, viewing the relevant class, as does the majority, as being the judiciary, more specifically the Associate Justices of the Supreme Court, do I consider such classification arbitrary and unreasonable. It is true that the members of that Court perform like judicial duties, as do members of other courts affected by the statute. Yet the legislator-appointee would receive, at least for the time (during the statutory life of *N. J. S. A.* 2A:1A–6), less compensation than that of his colleagues. This is not so for an arbitrary or unreasonable cause, but only because he would otherwise be ineligible for office, a legitimate foundation for the classification, lest all current legislators be ineligible for appointment to judicial office, a drastic constitutional result never intended by the people. The classification then, in my opinion, is not based upon an arbitrary or unreasonable foundation. *Harvey v. Essex Cty. Bd. of Freeholders,* 30 *N. J.* 381, 389–91 (1959) ; *Koons v. Atlantic City Bd. of Comm'rs,* 134 *N. J. L.* 329, 332–33 (Sup. Ct. 1946), *aff'd,* 135 *N. J. L.* 204 (E. & A. 1947) ; *Budd v. Hancock, supra,* at 135, 136–37; *Van Riper v. Parsons,* 40 *N. J. L.* 1, 8–9 (Sup. Ct. 1878).

That foundation of course is viewable in two aspects, — if deemed as intended to circumvent the Constitution, arbitrary and unreasonable and thus within the constitutional ban. But seen in another way, as I see it for the many reasons stated, as an honest legislative attempt to comply with the Constitution, it is not arbitrary nor unreasonable and is thus constitutionally sound in all respects. It is not an illegal evasion of a constitutional provision or prohibition, to accomplish a desired result, lawful in itself, by discovering or following a legal way to do it. *Clayton v. Kervick,* 52 *N. J.* 138, 151–52 (1968).

And even if one were to entertain a reasonable doubt on this point, "it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be de-

clared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt." *Behnke v. New Jersey Highway Auth., supra,* 13 *N. J.* at 25.

Many of the decisions quoted, interpreting a constitutional provision such as here, forswear a literal application and endeavor to ascertain the true constitutional purpose. *Meredith v. Kauffman, supra; Mayor and Comm'rs v. Green, supra; State ex rel. Lyons v. Guy,* 107 *N. W.* 2d 211 (N. D. 1961); *Spears v. Davis, supra; Shields v. Toronto, supra.*

In applying the same rule of interpretation to our Constitution's "ineligibility" clause I would conclude, as noted, that the "exclusion" provision of the judicial salary increase act (*N. J. S. A.* 2A:1A–8) is not an attempt to circumvent the constitutional safeguard. On the contrary, as here construed to provide unconditionally for the withholding from the appointee of the emoluments increased by 2A:1A–6, I deem the statute to be faithful to the basic constitutional purpose and consistent in all respects with the constitutional requirement.

I would hold the Wiley nomination, therefore, free of such statutory limitation, to be lawful and constitutional. Justices PASHMAN and SCHREIBER authorize me to state that they join in this opinion.

PASHMAN, J., dissenting. I join with the Chief Justice in concluding that Senator Wiley is eligible for appointment to this Court. However, I wish to emphasize my disagreement with Part I of the majority's opinion.

The four-member majority which joins in this section of the Court's opinion holds Senator Wiley's appointment invalid solely for the reason that the Salary Increase Act violates the special laws provision, *N. J. Const.* (1947), Art. IV, § 7, ¶ 9, cl. (5). I believe that its treatment of this question seriously distorts the limited function of this constitutional provision and applies a test which is wholly at odds with logic and precedent. This novel interpretation

would permit the Court to strike down any statute whenever it disagreed with the legislative purpose.

I

The majority finds that the Salary Increase Act, *N. J. S. A.* 2A:1A–6 *et seq.* is an unconstitutional "special law"; it purportedly saves the law by excising section eight (salary exemption for legislator-appointees) from the act. Because the majority's decision ensures that the salary increase will thereby be applicable to any legislator appointed to a judicial post, the constitutional disqualification clause bars the appointment. I believe that the initial link in this chain of reasoning — that the Salary Increase Act is a "special law" — is erroneously conceived.

The majority's holding that the act is a "special law" rests on two premises: (1) that since all justices of the New Jersey Supreme Court perform the same work and have the same responsibilities, they must be classified within the same category for salary purposes; and (2) that the Salary Act had, and constitutionally could only have had, the single objective of increasing the salaries of members of the Judiciary. Neither premise is correct.

A

The majority's initial premise, that the statutory classification must result in all justices on the Court being treated alike, misconceives the concept of special legislation. The correct inquiry under that constitutional provision is whether persons prevented from receiving the salary increase under the act have some definable characteristic which makes their exclusion rational when measured in terms of the purposes which the law seeks to accomplish. *Alfred Vail Mut. Assoc. v. Bor. of New Shrewsbury,* 58 *N. J.* 40, 49 (1971); *Roe v. Kervick,* 42 *N. J.* 191, 233 (1964); *Harvey v. Essex County Bd. of Freeholders,* 30 *N. J.* 381, 389 (1959); 2 *Sutherland, Statutory Construction* (3 ed. rev. 1973), § 40.01 *et seq.*

Thus, the Legislature is free to create any classification in salary structures, as long as the categories which are chosen further some legitimate interest of the State. If any "conceivable state of facts" exists which would support the legislative classification as a reasonable means of achieving the statutory purposes, the law will be sustained against a challenge that it is "special." *Harvey v. Essex County Bd. of Freeholders, supra; Wilson v. Long Branch,* 27 *N. J.* 360 (1958), *cert.* den. 358 *U. S.* 873, 79 *S. Ct.* 113, 3 *L. Ed.* 2d 104 (1958).

While explanations of what does and what does not constitute special legislation have been stated and restated by our courts, it is well established that it is not what a law *includes* that makes it special, but what it *excludes. Budd v. Hancock,* 66 *N. J. L.* 133, 135 (Sup. Ct. 1901). This principle was stated by the Court in *Harvey v. Essex County Board of Freeholders, supra*:

> In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. * * * If no one is excluded who should be encompassed, the law is general.
> [30 *N. J.* at 389; citation omitted]

And its application was explained by the court in *Budd v. Hancock*:

> Within this distinction between a special and a general law, the question in every case is whether an appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects, it is a general law. Hence, if the object of a law have characteristics so distinct as reasonably to form, for the purpose legislated upon, a class by itself, the law is general, notwithstanding it operates upon a single object only; for a law is not general because it operates upon every person in the state, but because every person that can be brought within its predicament becomes subject to its operation.
> [66 *N. J. L.* at 135–136]

*See also, Kline v. N. J. Racing Comm.,* 38 *N. J.* 109, 117–118 (1962); *Koons v. Bd. of Comm'rs of Atlantic City,* 134 *N. J. L.* 329 (Sup. Ct. 1946), aff'd o. b. 135 *N. J. L.* 204 (E. & A. 1946).

But the majority fails to focus upon whether there is any characteristic of persons prevented from receiving the salary increase which would justify such an *exclusion,* and instead emphasizes the fact that there are characteristics which would justify their *inclusion* within the Act. It attempts to measure the impact of the statutory classification *after* the legislator-appointee assumes a position on the Court, finding that any justice who would be denied the salary increase would differ "in no significant respect from the other five Associate Justices." See *ante* at 300. While the nature of the justices' duties would have supported a decision by the Legislature to classify all associate justices within the same category for salary purposes, its failure to focus on that factor alone is not a sufficient reason for striking down the act. As the court stated in *Equitable Beneficial Ass'n v. Withers,* 122 *N. J. Eq.* 134 (Ch. Div. 1937):

[T]he mere fact that the legislature has exempted certain specified classes from the operation of what would otherwise be an act of general application, is not in itself sufficient to invalidate the statute, unless it appears that such an exemption is arbitrary and lacking in a reasonable basis and foundation.

[122 *N. J. Eq.* at 138.]

Moreover, as long ago as 1878, Chief Justice Beasley conclusively rejected the majority's approach of ascertaining whether a law had the effect of creating disparities among persons having, to some extent, similar characteristics. He noted in *Van Riper v. Parsons,* 40 *N. J. L.* 1 (Sup. Ct. 1878) that a broad interpretation of the words "special" and "local" in terms of the effect or applicability of a statute "would render almost every attempt at useful legislation abortive." [*Id.* at 8].

The Court's analysis in *Harvey v. Essex County Bd. of Freeholders, supra,* demonstrates the foregoing principles. There the Court reviewed a statute imposing a mandatory retirement age of 65 for court attendants. Although the statute applied generally to all court attendants, it exempted

from the retirement requirement those persons who were not members of the county employees' retirement system. The claim in that case presented the same argument as that which is raised today — that Art. IV, §7, ¶9, cl. (5) prohibited the classification. The Court rejected the challenge to the statute even though the distinguishing legislative characteristic (membership in a county retirement system) was unrelated to the tasks or the duties of court attendants. Unanimously, we held:

> It is well established that the Legislature has a wide range of discretion in determining classifications and distinctions will be presumed to rest upon a rational basis "if there be any conceivable state of facts which would afford reasonable support for them." * * * A "conceivable state of facts," and one reasonably assumed, although not explicitly stated in the record, could be that the Legislature decided to exclude from retirement those over 65 and not members of the retirement system because the non-members would have no pension upon which to rely. A classification based on the ground of financial ability to care for oneself and a policy judgment as to the desirability of limiting those over 65 in this type of hazardous work are reasonable approaches to a serious problem for the individuals concerned and for the welfare of the county.
> [30 *N. J.* at 390–91; citations omitted.]

Similarly, in *Ervolini v. Camden County,* 127 *N. J. L.* 473 (Sup. Ct. 1941) the court upheld an enactment which failed to classify persons according to the work that they performed. That case involved a statute setting salary scales for constables and court attendants who performed the same services in counties of the same population class. The court held that basing differences in salary upon whether or not the individual was employed by a county which had adopted the Civil Service Act did not violate the special laws provision, stating:

> A law to be general must operate equally upon all of a group of objects which, *having regard to the purposes of the legislation,* are distinguished by characteristics sufficiently marked and important to make them a class by themselves.
> [*Id.* at 475; emphasis added.]

*Accord, Lynch v. Borough of Edgewater, 8 N. J. 279, 292* (1951).

Hence, the test is *not* whether all justices on the Court perform the same work and assume the same responsibilities, but whether the Legislature could have rationally excluded legislator-appointees from receiving the salary increase during their elected terms. The Court is required to uphold the legislative classification if there is "any conceivable state of facts" which would suggest a rational reason for the statutory exemption.

Applying these principles to the Salary Increase Act, the Court must, first, determine whether the persons excluded from receiving the salary increase are marked by characteristics which are sufficiently distinct to set them apart from the general class of justices who would receive the increase. Clearly, the statutory exemption applies only to legislator-appointees who served in elected office when the Salary Increase Act was passed. Second, the exemption must be rationally related to the purposes of the legislation. The "conceivable state of facts" justifying the exemption is precisely the same as that which prompted the framers of our Constitution to adopt the disqualification clause. That constitutional provision was intended to eliminate the personal bias which might affect a legislator's vote on a salary increase bill, without entirely excluding legislators from appointive office during their elected terms. Hence, the compromise which finally emerged as our present constitutional provision balanced two related but somewhat conflicting goals. The Legislature, in enacting the Salary Increase Bill, has rationally exempted legislator-appointees in section eight in order to accomplish the same competing goals and to ensure that the act would not be passed for improper reasons. Not only is the exemption rationally tailored to meet the purpose of the section, but it is the only means by which this legislative purpose could have been accomplished.

## B

However, the majority refuses to consider whatever reasons the Legislature might have had in enacting section eight. Mr. Justice Mountain finds that the statute had only one object, to raise judicial salaries, and that therefore, any classification must further that sole objective. *See ante* at 298. He states that even if the legislation *did* have the corollary objective of comporting with the disqualification clause, this "in no way can be said to create a valid classification within the framework of this legislation."

Initially, the factual conclusion that the Salary Increase Act was only intended to raise judicial salaries, and nothing more, is erroneous. Committee amendments to the Salary Increase Act indicate that the act was passed with the intent of comporting with the constitutional disqualification clause, and preventing legislator-appointees from receiving the increase. *See* Senate Judiciary Committee statement accompanying the committee amendments to what is now *L.* 1974, *c.* 57. Moreover, this Court is not required to inquire into legislative motives if there is any state of facts which would support a classification. *Harvey v. Essex County Bd. of Freeholders, supra; Wilson v. Long Branch, supra.* Thus, the Court stated in *Washington National Ins. Co. v. Bd. of Review*, 1 *N. J.* 545 (1949), that:

[T]he Legislature may, . . ., make distinctions of degree having a rational basis; and they will be presumed to rest on that basis if there be any conceivable state of facts which would afford reasonable ground for its action.

[*Id.* at 552.]

But the majority suggests that any attempt by the Legislature to draft the Salary Increase Act to comport with the constitutional disqualification clause would violate Art. IV, §7, ¶4, which cautions against a law embracing more than one object. Once again, the law does not support this conclusion.

Art. IV, §7, ¶4 has never been held to prevent the enactment of a statute merely because it included within its terms an exemption. That constitutional provision is simply irrelevant to this entire controversy. Its true application is made clear in numerous decisions holding that it is intended to prevent "logrolling," and to give notice to the public and legislators of the subject to which an act relates. *See e. g., Kline v. New Jersey Racing Comm'n, supra; State v. Zelinski,* 33 *N. J.* 561 (1961); *State v. Czarnicki,* 124 *N. J. L.* 43 (Sup. Ct. 1940); *Burlington v. Pennsylvania,* 104 *N. J. L.* 649 (E. & A. 1928). Thus, Sutherland writes that:

The constitution is complied with if the various provisions relate to, and are a means of carrying out the general purpose of an enactment. * * * If there is any reasonable basis for grouping the various matters together, and if the public will not be deceived, the act will be sustained.

[1A, *Sutherland, supra* § 17.03 at 6; footnotes omitted]

Most courts, in considering challenges that an act dealt with more than one object, have simply focused upon whether the title of the act in question sufficiently gave notice of the general purpose of the legislation. For instance, referring to challenges that a statute embraced more than one object in violation of this same provision, Mr. Justice Mountain stated for a unanimous Court in *Painter v. Painter*:

As has been often noted, the title of a statute is intended to be a label and not an index. * * * The constitutional requirement is satisfied when the title gives notice to the Legislature and to the public of the general purpose of the Act and is not in any way misleading.

[65 *N. J.* 196, 206.]

In that case, and in the companion case of *Chalmers v. Chalmers,* 65 *N. J.* 186 (1974), the Court held that a statute dealing with both dissolution of a marriage and distribution of assets was one object within the meaning of

Art. IV, § 7, ¶ 4. In the *Chalmers* case, Mr. Justice Sullivan wrote for the Court, noting that the Constitution required only that the statutes provisions relate to the general purpose of the legislation and be adequately expressed in the title. 65 *N. J.* at 195.

One would think that this case would be easily covered by the general rule in *General Public Loan Corp. v. Director of Division of Taxation,* 13 *N. J.* 393 (1953), that:

exceptions and provisos [in legislative enactments] are not objectionable unless it can be shown that they have no reasonable connection with the purpose of the statute . . . .

[*Id.* at 403.]

Are we to believe that the provision restricting a legislator-appointee from receiving the salary increase is unrelated to the Salary Increase Act?

## II

There is nothing to support the majority's conclusion that the Salary Increase Act is a special law. Its argument, based, in part, on the "one-object" rule is wholly unpersuasive, and brings to mind a passage in an article entitled "No Law Shall Embrace More Than One Subject":

When the one-subject rule is examined from the purely pragmatic point of view of the advocate, the rule appears as a weak and undependable arrow in a quiver. The most remarkable fact that emerges from this investigation is that, while the rule has been invoked in hundreds of cases, in only a handful of cases have the courts held an act to embrace more than one subject. *This seems to justify the courthouse lore to the effect that an argument based on the one subject rule is often the argument of a desperate advocate who lacks a sufficiently sound and persuasive one.*

[1A *Sutherland, supra* at 523; emphasis added.]

I would hold Senator Wiley's appointment constitutional in all respects.

Chief Justice HUGHES and Justice SCHREIBER join in this dissent.

*For affirmance*—Justices MOUNTAIN, SULLIVAN and CLIF-FORD and Judge CARTON—4.

*For reversal*—Chief Justice HUGHES and Justices PASH-MAN and SCHREIBER—3.