593 A.2d 710

STATE OF NEW JERSEY; JAMES J. FLORIO, GOVERNOR OF THE STATE OF NEW JERSEY; ROBERT J. DEL TUFO, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; JOAN HABERLE, SECRETARY OF STATE OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. APPORTIONMENT COMMISSION, CREATED PURSUANT TO N.J. CONST. (1947), ART. IV, § III, ¶ 1; FIDEL GONZALEZ; CITY OF NEWARK, A POLITICAL SUBDIVISION OF THE STATE OF NEW JERSEY; CITY OF EAST ORANGE, A POLITICAL SUBDIVISION OF THE STATE OF NEW JERSEY; SHARPE JAMES, MAYOR OF THE CITY OF NEWARK; CARDELL COOPER, MAYOR OF THE CITY OF EAST ORANGE, AND JOHN DOE(S), A PERSON OR PERSON(S) WITH AN INTEREST IN THIS MATTER, DEFENDANTS, AND JOHN H. DORSEY, SENATOR, 25TH DISTRICT OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT, AND COUNTY OF ESSEX, A POLITICAL SUBDIVISION OF THE STATE OF NEW JERSEY; AND THOMAS J. D'ALESSIO, THE ESSEX COUNTY EXECUTIVE, DEFENDANTS-APPELLANTS.

Argued February 25, 1991—Decided February 27, 1991.

*William Harla,* Assistant Attorney General, argued the cause for appellants State of New Jersey, et al. (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Francine A. Schott* argued the cause for appellants Democratic members of the Apportionment Commission (*Genova, Burns & Schott,* attorneys).

*Stephen J. Edelstein,* Acting Essex County Counsel, argued the cause for appellants County of Essex, etc., et al.

*George R. Gilmore* argued the cause for respondents Republican members of the Apportionment Commission (*Gilmore & Monahan,* attorneys).

*Steven L. Saks–Wilner,* Chief Counsel and Deputy Executive Director to Senate Minority, argued the cause for respondent John H. Dorsey, etc.

PER CURIAM.

The issue in this declaratory-judgment action is whether census data received by the Governor on or about January 24 and 30, 1991, constitute the "official decennial census" within the meaning of article IV, section 3, paragraph 1, of the State

Constitution. Appellants filed notices of appeal on February 22, 1991, and we promptly certified the appeals on our own motion. See *Rule* 2:12-1. After reviewing the record and briefs that had been submitted to the Law Division, we heard oral argument on February 25, 1991. Our expedited disposition of the appeals allows for implementation of the subject constitutional provision concerning legislative apportionment. Further delay might have jeopardized the conduct of primary and general elections in accordance with currently-existing statutes and constitutional provisions. We determine that the census data received by the Governor on or about January 24 and 30, 1991, constitute the "official decennial census" for purposes of invoking the subject apportionment provisions of the State Constitution.

## I.

For purposes of this appeal, we draw generally on the background developed in the Law Division proceedings.

Under the State Constitution, the responsibility for drafting a legislative-apportionment plan following a federal decennial census is vested in a ten-member Apportionment Commission normally composed of five Democrats and five Republicans. The Commission is required to certify to the Secretary of State a plan establishing election districts for the State Senate and General Assembly "within one month of the receipt by the Governor of the official decennial census of the United States for New Jersey." *N.J. Const. of 1947* art. IV, § 3, ¶ 1. In the event a majority of the Commission cannot agree on and certify a plan to the Secretary of State in a timely manner, the Chief Justice of the New Jersey Supreme Court is authorized to appoint an eleventh member. *Id.*, ¶ 2. The Commission then has an additional month within which to certify a plan to the Secretary of State to be used to elect Senators and members of the General Assembly.

On or about January 24, 1991, Governor Florio received from the federal Census Bureau the census data derived from the

1990 count. However, in a January 30, 1991, letter regarding those data and "census maps" sent under separate cover, Marshall L. Turner, Jr., the Chief of the 1990 Census Redistricting Data Office, Bureau of the Census, informed Governor Florio that although the transmitted data "fulfill[ ] the requirements of Title 13, U.S.C. 141(c) [a federal statute relating to the census,] [t]he population counts are subject to possible correction for undercount or overcount."

The Attorney General contends, without disagreement from any other party, that Chief Turner's reason for adding the above-quoted caveat is that under a stipulation order entered in certain federal litigation pending in the Eastern District of New York, *City of New York v. United States Department of Commerce*, the Census Bureau had agreed to consider "adjusting" its current figures in recognition of claims that the data might reflect a substantial undercount of minority populations. Chief Turner's letter recited that "[t]he United States Department of Commerce is considering whether to correct these counts and will publish corrected counts, if any, not later than July 15, 1991."

The scope of the practical problems is illustrated by the fact that the State Constitution requires New Jersey's bipartisan Apportionment Commission to draw the district lines within one month of the Governor's receipt of the official decennial census. If the official figures are used and later adjusted, districts used in primary elections might have to be changed for the general election in November. On the other hand, if the Commission waits until July 15, 1991, for receipt of any possible corrections, it might be August 15th before a tiebreaker could be appointed under the constitutional provision, and then possibly September 15th before the tie breaker could bring about the development of an apportionment plan. Under current statutory filing schedules, see, *e.g.*, *N.J.S.A.* 19:23–14, it realistically would be impossible to conduct primary and general elections on that timetable.

## II.

Some understanding of the history of the constitutional provisions will aid in our decision. The general history of this is well set forth in Professor Robert F. Williams' *The New Jersey State Constitution*, at 60–63 (1990) (hereinafter "Williams"), which we summarize here. In *Jackman v. Bodine*, 43 *N.J.* 453, 205 *A*.2d 713 (1964), this Court ruled that the provisions of the State Constitution of 1947 establishing a Senate composed of one member from each county and a sixty-member Assembly in which the counties were represented generally according to their population were unconstitutional as a violation of the United States Supreme Court's one-person, one-vote decision in *Reynolds v. Sims*, 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed*.2d 506 (1964). In *Jackman*, the Court concluded that a Constitutional Convention might be convened, without a vote of the people on its necessity. The 1966 Constitutional Convention proposed that the State Senate have forty members and the General Assembly eighty members—all elected by districts. *N.J. Const. of 1947* art. IV, § 2, ¶ 1 and ¶ 3. Enactment of those provisions brought an end to the equal representation of counties.

A central concept of the new provisions was that the Senate districts should, whenever practicable, consist of one or more whole counties, whereas the Assembly districts would, with certain exceptions, be portions of the Senate districts. However, this Court held in *Scrimminger v. Sherwin*, 60 *N.J.* 483, 291 *A*.2d 134 (1972), that under the demographic pattern revealed by the 1970 census, it was impossible to execute the design of our State Constitution without violating the one-person, one-vote concept developed by the United States Supreme Court. We concluded that the Apportionment Commission had to draw forty Senate districts of equal population, irrespective of our State Constitution's mandate that Senate districts consist of one or more whole counties. *Id.* at 497–98, 291 *A*.2d 134. Later federal Supreme Court refinement of the

principles of *Reynolds v. Sims, supra,* 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506, did not substantially alter that result. See *Davenport v. Apportionment Comm'n of N.J.,* 63 *N.J.* 433, 308 *A.*2d 3 (1973).

The provision with which we are concerned, article IV, section 3, paragraph 1, also dating from 1966, provides:

> 1. After the next and every subsequent decennial census of the United States, the Senate districts and Assembly districts shall be established, and the senators and members of the General Assembly shall be apportioned among them, by an Apportionment Commission consisting of ten members, five to be appointed by the chairman of the State committee of each of the two political parties whose candidates for governor receive the largest number of votes at the most recent gubernatorial election. Each State chairman, in making such appointments, shall give due consideration to the representation of the various geographical areas of the State. Appointments to the Commission shall be made on or before November 15 of the year in which such census is taken and shall be certified by the Secretary of State on or before December 1 of that year. The Commission, by a majority of the whole number of its members, shall certify the establishment of Senate and Assembly districts and the apportionment of senators and members of the General Assembly to the Secretary of State within one month of the receipt by the Governor of the official decennial census of the United States for New Jersey, or on or before February 1 of the year following the year in which the census is taken, whichever date is later.

That provision "is designed to take the intensely political matter of reapportionment out of the hands of the legislature, and assign it to an apportionment commission. Therefore, it is now the commission, not the legislature, which adopts reapportionment plans and whose product is reviewed by the courts." Williams, *supra,* at 62 (footnote omitted). Once the schedule has been set in place under section 3, paragraph 1, then section 3, paragraph 2 provides the tiebreaker mechanism to be invoked when the Commission is unable to reach an agreement before its constitutionally-imposed deadline.

### III.

With the foregoing as background, we approach the question of the meaning of the constitutional phrase "the official decennial census of the United States for New Jersey."

The principles that we apply are well settled:

It is a familiar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in our State Constitution the language is the voice of the people. As this Court said some twenty years ago,

> [T]he Constitution derives its force, not from the Convention which framed it, but from the people who ratified it; and the intent to be arrived at is that of the people.
>
> *    *    *    *    *    *    *    *
>
> The Constitution was written "to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning"; and "where the intention is clear there is no room for construction and no excuse for interpolation or addition." [*Vreeland v. Byrne*, 72 *N.J.* 292, 302, 370 *A.*2d 825 (1977) (citations omitted).]

In *Vreeland,* the Court reflected on the differing judicial roles involved in interpreting constitutional provisions, particularly whether a provision is to be considered a "great ordinance" of the Constitution, or a flexible pronouncement constantly evolving in response to the felt needs of the time, or an article of "different and less exalted quality." *Id.* at 304, 370 *A.*2d 825. Clear examples of the latter are provisions such as article IV, section 4, paragraph 6, that require bills and joint resolutions to be read three times in each house before final passage. Although it may be appropriate to give a liberal reading to the "great ordinances of the Constitution" as they may have relevance to the problems of the day, "more literal adherence to the words selected in those clauses carefully defining the mechanics and administration of government is mandated." *Atlantic City Racing Ass'n v. Attorney General of N.J.,* 98 *N.J.* 535, 545, 489 *A.*2d 165 (1985). As Justice Mountain wrote in *Vreeland v. Byrne, supra,* 72 *N.J.* at 305, 370 *A.*2d 825, "[w]here in the one case the underlying spirit, intent and purpose of the Article must be sought and applied as it may have relevance to the problems of the day, in the other a literal adherence to the words of the clause is the only way that the expressed will of the people can be assured fulfillment."

Of course, we agree that even though, on its face, language may appear to be clear and unambiguous, if in fact,

on examination, the true intent and purpose of the Framers and the people appear to differ from the ostensibly-clear language, then the language should be read and applied in accordance with such intent and purpose. So it is that the Court sometimes rejects a literal and grammatical reading of the State Constitution for reasons noted by Justice Jacobs in *Lloyd v. Vermeulen*, 22 *N.J.* 200, 206, 125 *A.*2d 393 (1956): "[S]ince words are inexact tools at best, resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used." The polestar of constitutional construction is always the intent and purpose of the particular provision. And in ascertaining what that intention is, we should ask, as we did in the context of an interpretive statement: does the public question "tell the ordinary voter what is involved"? *Gormley v. Lan*, 88 *N.J.* 26, 37, 438 *A.*2d 519 (1981).

"[T]hat the words employed [in the Constitution] have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication" is presumed. *Behnke v. New Jersey Highway Auth.*, 13 *N.J.* 14, 25, 97 *A.*2d 647 (1953); *Fischer v. Township of Bedminster*, 5 *N.J.* 534, 541–42, 76 *A.*2d 673 (1950). We should therefore "inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding * * * [for] [t]he Constitution was written 'to be understood by the voters.'" *Gangemi v. Berry*, 25 *N.J.* 1, 16, 134 *A.*2d 1 (1957) (quoting *United States v. Sprague*, 282 *U.S.* 716, 51 *S.Ct.* 220, 75 *L.Ed.* 640 (1931)).

We conclude that the meaning "most naturally and plainly convey[ed], the sense most obvious to the common understanding" of the phrase "official decennial census" embraces the data officially delivered to the Governor by the United States Census Bureau on January 24 and 30, 1991. We express no opinion on whether the census is complete for all federal purposes. We limit our decision to the meaning of

"official decennial census" within our Constitution. Neither *N.J.S.A.* 52:4–1, authorizing the Governor to file with the Secretary of State a copy of the bulletin issued by the census director as "an official promulgation of such census," nor *N.J.S.A.* 1:1–2, defining the word "census" as " * * * the latest Federal census effective within this State" requires a contrary result. The true purpose of the constitutional provision as it would be understood by the ordinary voter would be to establish a reasonably-reliable schedule for initiating the work of the Apportionment Commission. That schedule would be hindered by a flexible interpretation of the provision. Such an interpretation here could result in an almost completely unpredictable schedule for primary elections. It is possible that the specified dates could be shortened either because the Commission members accelerated the request for a tiebreaker, or the tiebreaker could bring about a rapid resolution of the redistricting maps; but the potential need nonetheless exists to alter significantly the current election timetables. For example, current law allowing fifty-four days between filing and election for both primary and general elections perhaps could not be followed.

Appellants also contend that because the census may not be "complete," it is not "official" or "authentic" for purposes of State legislative apportionment. The word "official" thus would connote the opposite of "preliminary" and would have been added by the 1966 Constitutional Convention to foreclose the use of "preliminary" figures as described in *Asbury Park Press, Inc. v. Woolley*, 33 *N.J.* 1, 161 *A.*2d 705 (1960). But the "preliminary" figures referred to there were those that the Census Bureau customarily made available in the middle of the decennial census year, not the type of figures that the Census Bureau released to the Governor in January 1991. In fact, the Census Bureau issued the preliminary census figures for New Jersey in August 1990.

Appellants further note that the stipulation in *City of New York* provided that *as part of* the 1990 decennial census the Bureau would conduct a "post-enumeration survey." Appel-

lants argue that that provision makes the census incomplete. But the same stipulation recited that the Bureau "intend[s] to report census counts in accordance with the dates set forth in 13 *U.S.C.* §§ 141(b), (c)." The first of those sections, 13 *U.S.C.A.* § 141(b) (1990), requires that the tabulation "be completed" by January 1st of the post-decennial year. According to the Bureau, the decennial census figures for New Jersey delivered to the Governor on January 24 and 30, 1991, represent the census figures required to be provided under 13 *U.S.C.A.* § 141(c) (1990). Communications surrounding the delivery of the census figures to the Governor also indicate that the Bureau regarded the census as "complete." The Bureau's press release announced: "The Census Bureau today delivered to Gov. James J. Florio and the state legislature the final 1990 census population count for New Jersey." The Director of the Bureau of Census, Barbara Everitt Bryant, also wrote: "Now that we have fulfilled that legal requirement [of delivery of the census to the President], we are sending you the official population counts for all jurisdictions in your state." Finally, as noted above, in a January 30th letter to the Governor, Chief Turner stated: "Under separate cover, we have transmitted the 1990 Census Public Law 94–171 population counts. In separate transmissions, we are sending you the corresponding census maps. This fulfills the requirements of Title 13, *U.S.C.* 141(c)."

The constitutional article seems to presume that normal year-end cycle, thus allowing for a reasonable time to develop the new district lines. Any substantial deviation from that normally-anticipated census cycle will pose the practical difficulties in maintaining election schedules that we have noted.

"It is a 'golden rule' of interpretation, fully applicable to constitutional as well as statutory documents, that the unreasonableness of a particular result arising from the selection of one among several possible alternative interpretations strongly militates in favor of the adoption of an interpretation that embraces a reasonable result." *Dickinson v. Fund for The Support of Free Pub. Schools*, 95 *N.J.* 65, 97, 469 *A.*2d 1 (1983)

(Handler, J., dissenting) (citing *Clifton v. Passaic County Bd. of Taxation*, 28 *N.J.* 411, 421, 147 *A.*2d 1 (1958)).

We appreciate that there are countervailing arguments of impracticality that the Commission should not embark on the difficult task of drawing new legislative districts when all of the efforts may prove worthless and result in a needless expenditure of State funds. Further, once the Commission acts, there is no explicit mechanism in the Constitution that provides that the Commission may meet again to make corrections or adjustments to a plan once certified to the Secretary of State. Instead, the Constitution provides that on certification a plan shall remain unaltered until the next federal decennial census. However, this Court has repeatedly been called on to make midcourse corrections in the apportionment process, see, *e.g., Jackman v. Bodine, supra,* 43 *N.J.* at 473–74, 205 *A.*2d 713. In *Scrimminger v. Sherwin, supra,* 60 *N.J.* at 485, 291 *A.*2d 134, the trial court, because of practical considerations, permitted the election scheduled for 1971 to proceed under the disapproved plan. It held, however, that no further election could be held under the defective plan.

We acknowledge the even more profound concern that should there be any substantial undercount in the January 1991 census figures, it will be to the disadvantage of the already-disadvantaged minority members of our community. Should revised census data result in a material deviation, either State or federal Constitutions might be invoked to remedy the wrong. It is thus premature to consider an application to stay the promulgation of a plan by the Apportionment Commission.

We affirm the Law Division's declaratory judgment that the census data received by the Governor's office on January 24 and 30, 1991, constitute the official decennial census within the meaning of article IV, section 3, paragraph 1, of the State Constitution. We also affirm the Law Division's judgment that the delivery on January 30, 1991, constituted the full receipt contemplated under the provision; "one month" from that date

as defined in the constitutional article is February 28, 1991. See *N.J.S.A.* 1:1–2; Black's Law Dictionary 908–909 (5th ed. 1979). Although the maps referred to in the January 30, 1991, transmittal letter did not accompany the letter, we are satisfied, as was the Law Division, that the letter served to authenticate the computer and other data delivered to the Governor on January 24 and for the purposes of this decision served better to define the date on which the "official decennial census" was received.

Judgment affirmed.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

Chief Justice WILENTZ did not participate.