DOUGHERTY, J.T.C.

Procedural History

Leonard Van Wingerden (Taxpayer) appeals from judgments of the Sussex County Board of Taxation, affirming Lafayette Township’s (the Township’s) assessments of Block 5, Lot 7.03 for tax years 1993 and 1994. The Township asserts the exemption in N.J.S.A 54:4-23.12 violates N.J. Const. art. VIII, § 1, ¶ 1(a).[1] The Attorney General, Deborah T. Poritz, intervenes (R. 4:28-4(d)) to defend the statute on behalf of the State of New Jersey.

The Issue

The pivotal issue is whether Taxpayer’s greenhouse is real property which must, by constitutional mandate, be subject to taxation under N.J.S.A. 54:4-1 or, whether it is personal property which may be classified as nontaxable under N.J.S.A. 54:4-23.12. This issue was advanced only in the 1994 matter.[2] For the *480 reasons which follow, it is held that: (1) the greenhouse is “real property”; (2) it is subject to taxation as “real property taxable” under N.J.S.A. 54:4-1; (3) N.J.S.A. 54:4-23.12 applies to exempt it from that tax; and (4) that exemption is void because it confers a private benefit, a preference, and is an impermissible classification of real property. N.J. Const. art. VIII, § 1,111(a).
For both Tax Years 1993 and 1994 Taxpayer also seeks a determination of a “reasonable depreciation deduction”. True value, Taxpayer contends, equals cost to construct the greenhouse, minus the depreciation deduction. Taxpayer concludes true value under this approach will require an assessment reduction in both years. Taxpayer fails, however, to offer evidence sufficient to overcome the presumption of correctness which attaches to the original assessments. The assessments must, then, be affirmed.

Findings of Fact

Block 5, Lot 7.03 is a twenty-two acre parcel, improved with a personal residence and a greenhouse used in Taxpayer’s business. For Tax Years 1993 and 1994 the property was assessed as follows:
Land $ 52,500
Improvements 797,500
Total $ 850,000
The parties stipulate to the following allocation of the assessment: 22 4- acres of land $ 52,500
Residence 215,500
Greenhouse 582,000
Taxpayer challenges only that portion of the assessment, allocated to the greenhouse — $582,000.
*481 In 1988 Taxpayer opened a horticultural business, which he conducts as a sole proprietorship. The business consists of the cultivation of cut flowers, roses, and anthurium for sale at wholesale. The flower business is conducted year round. In New Jersey this requires a greenhouse. Taxpayer’s greenhouse is glass, covering approximately an acre and a half of land.
Taxpayer purchased the greenhouse (sometimes herein referred to as a “house”) from the catalogue of V. & V. Noordland, Inc. Noordland is a major supplier in the industry of “Dutch” houses. The Dutch house is far different in design from the traditional “American Widespan” greenhouse. The Widespan is built on heavy foundations and walls. Its glass panels are welded together. Its roof has a single peak, and is supported by a heavy interior structure of trusses and beams. As the ground area covered by the Widespan expands, the height of the roof must rise. The higher the roof the greater the structure necessary to support and distribute its weight, and the weight of the glass paneled walls.
The Dutch style house is prefabricated in Holland in modular units (“houses”). Houses may be purchased in several different widths. The most common width (and that chosen by Taxpayer) is twenty-one feet. The roof of each house is low and has twin peaks. A drainage gutter lies between the peaks. Steel columns, evenly spaced throughout the interior as well as around the perimeter permit the weight of the structure to be evenly distributed throughout, rather than shifted to the perimeter walls alone as occurs with the American Widespan.
Under the Dutch design, houses may be connected to form any overall dimension as may be required by a grower. Houses are connected by sharing a gutter between their peaks. The connection is made on site, by nuts and bolts. The assemblage of multiple houses to cover a greater ground area, requires no greater roof height than for a single house. Each Dutch house is still self supported by its evenly spaced steel columns. The glass panels, which form the roof and walls of the Dutch house, slide into metal channels where they are held in place by a bead of *482 caulking material. The channels are bolted to each other and to the steel columns and interior trusses. Unlike the American house, there is no welding. The galvanized steel columns which support the structure of the Dutch house are attached by anchor bolts to concrete piers sunk into the earth. Greenhouses as large in area as thirteen acres and as small as 4000 square feet have been sold and assembled by V. & V. Noordland, Inc. Taxpayer’s consists of sixteen houses, covering an area in excess of 66,000 square feet.
Taxpayer’s sixteen houses are configured to form a “main greenhouse”, measuring 315 feet eight inches wide and 207 feet six inches long and a separate “shipping house”, twenty one feet wide and sixty nine feet nine inches long. These modular units were shipped in pieces to the subject property and assembled there by a specially trained work crew.
A concrete aisle, eight feet wide, is the only flooring installed in the main house. The aisle runs down the center of the house. The bare land is exposed, on each side of it. Taxpayer’s roses and anthurium are planted directly in the soil, in beds approximately three feet six inches wide, set perpendicular to the aisle.
Each individual plant is watered and fed by a tube which drips at intervals set by Taxpayer. The computerized controls for this irrigation system are located on a centralized panel in the shipping house. In addition to the drip tubes, two inch thin wall steel conduit tubing, set on stanchions four inches off the ground, runs along both sides of each bed. Warm water is run through this tubing, producing radiant moist heat. Some heat tubing is also installed above the plants, hanging from the overhead trusses. The computerized controls for the heating system are located on the centralized panel in the shipping house. The hot water boilers and a pump to distribute the water through the heating system are also installed there.
A fabric curtain (the “heat shield”) runs across the top of the main greenhouse. The heat shield, installed under the roof, hangs approximately twelve inches under each gutter. It sits above the *483 heating system. The shield can be adjusted to insulate against cold in winter and deflect direct sunlight in the heat of summer.
Some of the glass panels which form the roof and walls of the houses are set to a thermostat. They open automatically to provide ventilation as the temperature rises, and close automatically when the temperature falls. Other panels may be individually opened and shut for ventilation from the control panel. These panels have individual motors installed within them to facilitate their movement. The motors are wired to the main control panel.
The heating, heat shield, and ventilation systems were part of the “package” included in the houses sold by V. & V. Noordland, Inc. The irrigation system was not. Taxpayer separately contracted for its purchase and installation.
The shipping house has a concrete floor throughout. Located within it are: two 125 horse power boilers; a water tank and distribution pump; a ten foot by fifteen foot refrigerated storage “box”; the computerized thermostat and master control panel for the irrigation, heating, and ventilation systems; electrical panels; work tables for sorting flowers; a telephone; a desk for limited paper work; a small workbench, and tool storage area.
Twelve three phase motors which drive the windows of both the main house and the shipping house and move water through the heating system are dispersed throughout the main house, wired to the master control panel in the shipping house, and attached to the concrete flooring by flanges. The temperature in both houses is maintained, during the winter months at sixty four degrees at night and seventy degrees during the day, on the thermostat installed on the master control panel.
The refrigerated storage box, attached to the concrete floor of the shipping house by nails, is chilled by a compressor which rests on top of it. The box consists of cam-locked panels and a fan. The boilers are not physically attached to the floor but rest on movable sleds made up of two “I” beams. The master control panel is screwed into a plywood wall in the shipping house. The water tank in the shipping house and the various pumps and *484 mixing valves for the irrigation and heating systems are attached to concrete floor areas by flanges.
Outside the shipping house there are six propane tanks having an aggregate volume of 1500 gallons, and several oil tanks of similar capacity. All tanks rest, unattached, upon concrete blocks. Taxpayer uses propane to heat water, maintaining the oil as a backup fuel source. The propane and oil tanks are owned by the fuel vendors. Taxpayer draws water for operations from a well.
The main greenhouse and shipping house rest upon 500 concrete footings (“piers”). The piers are eighteen inches in diameter. Outside piers are set three feet deep, interior piers, two feet. Threaded rods % of an inch in diameter are set in “stovepipe” piping, in turn set within each eighteen inch footing while the footing concrete is wet. Galvanized steel posts, twelve feet high and approximately the same diameter as a two by four, are bolted to the threaded rods at ground level by angle irons. The connecting roof line gutters rest upon and are bolted to the steel columns.
Site preparation at the subject included minimal clearing, stripping of topsoil and grading of the land. The materials for assembling the houses arrived there in September 1987 in their shipping containers. The assembly and installation were completed in May 1988.
The contract between Taxpayer and V. & V. Noordland, Inc. provided a total purchase price for the sixteen modular units of $391,160. Of that sum, approximately $60,000 was attributed to labor to assemble. Additional costs were incurred by Taxpayer for the installation of the drip irrigation system; grading, drilling, pouring, and setting the concrete piers; installation of the electrical system, water well, and pump; refrigerated “cool box”; and the boilers. The record is unclear as to the total additional cost of each of these, except for the boilers, which Taxpayer said cost $24,000 uninstalled. The Township asserts a total actual cost to Taxpayer of $590,000, which is not disputed by Taxpayer. On a square foot basis the cost to Taxpayer to construct the greenhouse was $8.94.
*485 Both the main and shipping houses can be disassembled by removing the bolts and flanges which hold their various pieces together. The concrete piers likewise could be removed from the land in which they are sunk. A small market exists for “used” greenhouses and some of their parts. At trial Taxpayer’s expert testified to several sales which were relied upon to form an opinion of the “true value” of the greenhouse. That opinion was that the fair market, or “true” value, of a “used” greenhouse if sold separate from the land, is approximately $1.00 per square foot; while that value if sold with the land (and therefore not necessitating cost to disassemble, move and reassemble), is approximately $4.00 per square foot. Using Taxpayer’s numbers, the cost to dissemble and reassemble would approximate $1.82 per square foot [ ($60,000 x 2)-r 66,000 square feet]. Taxpayer’s greenhouse has a minimum life expectancy of thirty years. Some of V. & V. Noordland, Inc.’s houses, constructed in the 1930’s are still functioning.

Analysis of the Law

Whether N.J.S.A 54:4-23.12 is determined to be a classification of personalty or an exemption of realty the greenhouse must be “subject to tax” in the first instance. It will be subject to tax if it fits within the definition of “personal property taxable” or “real property taxable” under N.J.S.A 54:4 — 1.[3] N.J.S.A. 54:4-1 is the *486 tax imposition section under New Jersey’s scheme of ad valorem taxation. Only two classes of property, personal and real, fall within that section. Taxpayer cannot (and does not) claim the greenhouse is subject to tax as “personal property”. That class is too narrowly drawn to include either Taxpayer or the greenhouse. After 1966 personal property used in farming operations was no longer subject to the annual property tax, so that Taxpayer cannot turn to a specific statute imposing the tax upon the greenhouse.[4] Therefore,' the greenhouse will only be subject to tax if it is within the statute’s “real property taxable”.
Taxpayer and the State argue “real property taxable” under N.J.S.A 54:4-1 includes land, improvements upon the land and a whole class of personal property “affixed” to either. The greenhouse, they contend, is within “personal property affixed” and remains personal property. N.J.S.A 54:4-23.12, they contend, classifies certain of that personalty as nontaxable. N.J. *487 Const, art. VIII, § 1, H 2 (generally referred to as the “exemption clause”) is relied upon for the Legislature’s power to classify in this manner.[5]
The Township argues N.J.S.A. 54:4-23.12 is an exemption of real property. It asserts that, as applied to the greenhouse, N.J.S.A. 54:4-23.12 is an unconstitutional exemption because it classifies real property for a tax preference contrary to the mandates of N.J. Const. art. VIII, § 1, ¶ 1(a) (the “uniformity clause”).
To resolve these conflicting legal theories the court must examine the most basic component of our scheme of ad valorem taxation, “real property.” Of first importance is the meaning of the term “real property” in the tax clauses of the Constitution. The statutes will be measured against that meaning.

The meaning of “real property” in Art. VIII

The uniformity clause[6] mandates uniformity in the standard for assessment and rate of tax for “all real property”. The term “real property” is defined, however, in neither the Constitution nor the tax statutes. Five principles of statutory construction aid in our search for that meaning. Four of these *488 principles are described in State v. Apportionment Comm’n., 125 N.J. 375, 593 A.2d 710 (1991):
The principles that we apply are well settled: [First ] It is a familiar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in’ our State Constitution the language is the voice of the people. As this Court said some twenty years ago, ‘[T]he Constitution derives its force, not from the Convention which framed it, but from the people who ratified it; and the intent to be arrived at is that of the people.’
[Second ] The Constitution was written “to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning”; and “where the intention is clear there is no room for construction and no excuse for interpolation or addition.” [Vreeland v. Byrne, 72 N.J. 292, 302, 370 A.2d 825 (1977) (citations omitted).]
[125 N.J. at 380-81, 593 A.2d 710].
[Third ] The polestar of constitutional construction is always the intent and purpose of the particular provision. And in ascertaining what that intention is, we should ask, as we did in the context of an interpretive statement: does the public question “tell the ordinary voter what is involved”? Gormley v. Lam, 88 N.J. 26, 37, 438 A.2d 519 (1981).
“[T]hat the words employed [in the Constitution] have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication” is presumed. Behnke v. New Jersey Highway Avth., 13 N.J. 14, 25, 97 A.2d 647 (1953); Fischer v. Township of Bedminster, 5 N.J. 534, 541-42, 76 A.2d 673 (1950). We should therefore “inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding * * * [for] [t]he Constitution was written ‘to be understood by the voters.’ ” Gangemi v. Berry, 25 N.J. 1, 16, 134 A.2d 1 (1957) (quoting United States v. Sprague, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640 (1931)).
[125 N.J. at 382, 593 A.2d 710].
[Fourth ] “It is a ‘golden rule’ of interpretation, fully applicable to constitutional as well as statutory documents, that the unreasonableness of a particular result arising from the selection of one among several possible alternative interpretations strongly militates in favor of the adoption of an interpretation that embraces a reasonable result.” Dickinson v. Fund for The Support of Free Pub. Schools, 95 N.J. 65, 97, 469 A.2d 1 (1983) (Handler, J., dissenting) (citing Clifton v. Passaic County Bd. of Taxation, 28 N.J. 411, 421,147 A.2d 1 (1958)).
[125 N.J. at 384-5, 593 A.2d 710],
Sutherland on Statutory Construction adds the Fifth rule: “the interpretation of well defined words and phrases in the common law carries over to statutes dealing with the same or similar subject matter ...” and “common law meanings are assumed to apply even in statutes dealing with new and different subject *489 matter, to the extent they appear fitting and in the absence of evidence to indicate contrary meaning.” 2A Sutherland, Statutory Construction (5th Ed.1992) § 50.03, p. 103; Magierowski v. Buckley, 39 N.J.Super. 534, 121 A.2d 749 (App.Div.1956); see also, National Lead Co. v. Bor. of Sayreville, 132 N.J.Super. 30, 331 A.2d 633 (App.Div.1975).
In recent years our Supreme Court has examined extensively the historical foundations, intent, and purposes of both the uniformity and exemption clauses. N.J. Turnpike Authority v. Washington Township, 16 N.J. 38, 106 A.2d 4 (1954); General Electric Co. v. City of Passaic, 28 N.J. 499, 147 A.2d 233 (1958); N.J. State League of Municipalities v. Kimmelman, 105 N.J. 422, 522 A.2d 430 (1987); Town of Morristown v. Woman’s Club of Morristown, 124 N.J. 605, 592 A.2d 216 (1991). It has determined that N.J. Const. art. VIII, § 1,¶¶ 1(a) and 2 were adopted in their present form to accomplish three purposes: (i) to insure that all real property be subject to ad valorem taxation; (ii) to preserve, however, traditional exemptions for charitable, religious, and educational uses; and (iii) to prevent the exemption of real property from taxation, in whole or in part, by classification. Town of Morristown v. Woman’s Club of Morristown, 124 N.J. 605, 592 A.2d 216 (1991).
In N.J. State League of Municipalities v. Kimmelman, 105 N.J. 422, 522 A.2d 430 (1987) our Supreme Court explored the law as it existed before the 1947 Constitution:
[I]t was concluded that the Legislature, in the exercise of the sovereign power of taxation, was free to select subjects of taxation____class taxation was valid so long as there was compliance with the classification rule that all reasonably within the class are included, that uniformity prevail throughout the whole class, and that property be taxed at true value____ It was similarly concluded that since the tax clause did not require that all property shall be assessed for taxes, the Legislature could classify property for purposes of exemption for [sic] taxation subject always, of course, to strict observance of the classification rule. Elimination of a single member of a natural class would invalidate the statute.
[105 N.J. at 429. 522 A.2d 430].
In 1941 the Legislature amended the Railroad Tax Law to provide a tax preference for the railroad industry. The Court recounts that a “fire storm” erupted within the State when the *490 Errors and Appeals Court sustained that amendment, holding in Jersey City v. Kelly, 134 N.J.L. 239, 47 A.2d 354 (E. & A.1946) that railroad property could, within constitutional confines, be segregated for valuation purposes and assessed at a lower rate of tax. The uniformity and exemption clauses it says, arose out of that controversy; the uniformity clause, mandating that all real property share equally the financial burdens of government and the exemption clause, tolerating limited inequality. The Court reconciles the two clauses in the following manner:
How can we reconcile this restraint [arising out of the uniformity- clause] on the power of the Legislature with the apparent power in the next paragraph of the tax clause to grant exemptions? In the process of the constitutional debate the exemption power was separated out from the uniformity clause and the current exemption language was put in the separate paragraph 2. We think that reconciliation can be achieved through recognition that when the delegates dealt with the exemption power, they considered it as being exercised in the historical mold of the public purpose — then seen primarily as educational, charitable, and religious purposes.
[N.J. State League of Municipalities, supra, 105 N.J. at 437, 522 A.2d 430].
Reciting that background, the Court in N.J. State League of Municipalities, supra, held unconstitutional a statute which provided that newly constructed single-family dwellings were not subject to assessment and taxation until a certificate of occupancy had been issued and the dwelling had been actually occupied. It held:
Given that the constitutional focus of the delegates on the taxation of real estate was upon a judicial decision that had sustained the power of the Legislature, prior to the 1947 Constitutional Convention, to allow for preferential taxation of real estate based on the classification of the industry, Jersey City v. Kelly, 134 N.J.L. 239, 47 A.2d 354 (E. & A.1946), and given that the single galvanizing event that brought about agreement on a tax article was a compromise that gave greater flexibility to the executive and legislative branches in taxing all types of property other than real estate, with the apparent purpose of providing that real property dedicated to municipal tax purposes should never be taxed at an unequal burden, we cannot conclude that the delegates intended that the legislature could achieve, by the exemption clause, what could not be done under the constitutional restraints imposed upon it.
[N.J. State League of Municipalities, supra, 105 N.J. at 436, 522 A.2d 430].
The three purposes of the tax clauses are clearly apparent in this history. The meaning of “real property” in those clauses must be consistent with that history. Beginning with the assumption that the words in the uniformity clause were intended to take their *491 common law meaning, we turn to find the common law as it existed in 1947.
The best statement of the common law definition of “real property” in the State of New Jersey in 1947 is its origin in Teaff v. Hewitt, 1 Ohio St 511 (Sup.Ct.1853). See, Bank of America v. La Reine Hotel, 108 N.J.Eq. 567, 156 A. 28 (Ch.1931); Feder v. Van Winkle, 53 N.J.Eq. 370, 33 A. 399 (E. & A.1895); Standard Oil v. Atlantic City, 18 N.J.Misc. 582, 15 A.2d 271 (N.J.Bd.Tax App.1940); and Fahmie v. Nyman 70 N.J.Super. 313, 175 A.2d 438 (App.Div.1961). To determine when personal property which has been affixed to land (or to an improvement on the land) has become real property Teaff recognizes an objective, facts and circumstances test, the keystone of which is intent:
the united application of the following requisites will be found the safest criterion of a fixture[:] 1st. Actual annexation to the realty, or something appurtenant thereto. 2nd. Appropriation to the use or purpose of that part of the realty with which it is connected. 3rd. The intention of the party making the annexation, to make the article a permanent accession to the freehold [estate] — this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made.
[Teaff, supra, 1 Ohio St. at 530].
See, 5 American Law of Property § 19.3, at 18.
The Teaff test describes “real property” as that term is used in art. VIII, § 1 of The New Jersey Constitution. That test is accepted for the following reasons. First, no evidence to indicate a contrary meaning at the time of adoption of the Constitution was offered by either Taxpayer or the State, nor have we uncovered any in our research. Second, the common law was well settled in 1947. It was deeply rooted in decades of jurisprudence; based upon concepts of fairness and common sense. The Teaff test was then, and is still today, accepted by the overwhelming majority of our sister states. It is not unreasonable to conclude that because the meaning was so well established no thought was given to defining the term “real property” for constitutional purposes. However, it would be unreasonable to conclude that a different meaning was intended, but not set out. Third, the common law definition of “real property” is virtually identical in this State *492 today to what it was in 1947. We have not rejected the common law, to the contrary we continue to turn, in New Jersey, to its definition. Finally, accepting a definition with such consistent meaning as the “fixed” standard against which to measure the effect of our tax statutes insures the uniform taxation of all real property. If, as has been argued, the Legislature is free to define “real property”, from time to time, (that is to change the standard) then it is free to nullify uniformity; to accomplish indirectly what it may not accomplish directly; to exempt by classification.

The meaning of “real property taxable” in N.J.S.A. 54:4-1.

Both Taxpayer and the State say the exemption clause permits the Legislature to classify personal property. They direct us to N.J.S.A 54:4-1.12[7] as an example of valid classification. Under that section, they explain, 30,000+ gallon storage tanks are deemed to be “real property taxable”, notwithstanding that, depending on the facts surrounding annexation, the “true” character of the tanks might be personal property. N.J.S.A. 54:4-23.12 accomplishes, under their theory, an identical classification of the greenhouse. This conclusion does not follow.
N.J.S.A. 54:4-1.12 is a tax imposition section; N.J.S.A. 54:4-23.12 is a tax “exclusion” or “exemption”. They are opposites. N.J.S.A. 54:4-1.12 provides that tax be imposed upon certain storage tanks no matter whether they are real property (which would have been subject to tax in any event) or personal property (which would generally have been nontaxable under N.J.S.A. 54:4-1). If the tanks are real property, uniformity in taxation is preserved. If they are personal, the Legislature has specifically created a taxable class of personal property, which clearly it may do. Not so, with N.J.S.A. 54:4-23.12.
*493 N.J.S.A. 54:4-23.12 redefines the term “structure” in order to exclude certain structures (e.g. the greenhouse) from taxation under N.J.S.A. 54:4-1. The section excludes either real property or personal property. If real, it is an exemption, which must be based upon a constitutionally valid foundation, such as use for a charitable, religious, or educational purpose.
Art. VIII, § 1, ¶ 1(b),[8] and its implementing legislation, N.J.S.A. 54:4-23.1, et seq., deal solely with the assessment of land. The assessment and taxation of all other real property taxable, are determined under the general rules of taxation, N.J.S.A. 54:4-1 et seq. “Real property taxable” is defined there as:
all land and improvements thereon ... includ[ing] personal property affixed to the real property or an appurtenance thereto, unless: a.(l) the personal property so affixed can be removed or severed without material injury to the real property; (2) ... can be removed or severed without material injury to ... itself; and (3) ... is not ordinarily intended to be affixed permanently to the real property.[9]
This language is plain on its face. It is consistent with the common law’s definition of real property. Intention is the critical factor in each. See American Hydro Power Partners v. City of Clifton, 11 N.J.Tax 12, 18 (Tax 1990), aff'd, 12 N.J.Tax 264 (App.Div.1991), (“the focus [in determining whether property “af *494 fixed” is real] is on the ordinary intention regarding permanent annexation with regard to property of the type in issue, not the actual intention of the owner of the particular property before the court” ...); N.Y.T. Cable TV v. Audubon Borough, 9 N.J.Tax 359 (Tax 1987), aff'd, 230 N.J.Super. 530, 553 A.2d 1368 (App.Div. 1989), certif. denied, 117 N.J. 646, 569 A.2d 1344 (1989) (where the Appellate Division, in affirming the Tax Court’s determination that a 250 foot high cable antenna tower bolted to concrete foundation piers was intended to be permanently affixed and therefore “real”], said “[w]e are ... fully satisfied that the [Tax Court] judge correctly applied an objective standard in making [the] determination, rather than assessing what was subjectively intended as to the permanence of the tower____” 230 N.J.Super. at 534, 553 A.2d 1368); Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205, 242-43 (Tax 1987) (holding a “reasonable person examining the ... connected mass of immense structures, piping, wiring, equipment and foundations [of an oil refinery] would consider that” “ordinarily intended to be affixed permanently ...” and also noting “[i]nitially, the fact that property is removable without physical injury to it or the real property to which it is affixed does not stand in the way of the conclusion this court has made that the same property is ordinarily intended to be affixed permanently to the real property”); R.C. Maxwell Co. v. Galloway Tp., 13 N.J.Tax 519 (Tax 1993), aff'd, 15 N.J.Tax 187 (App.Div.1995), certif. granted, 142 N.J. 456 (1995), (where the Appellate Division, affirmed the Tax Court’s determination that billboards, fixed in place since the late 1950’s were taxable under N.J.S.A. 54:4-1(a) because they were “ordinarily intended to be affixed permanently.”) R.C. Maxwell, supra, 15 N.J.Tax at 189; Fahmie v. Nyman, 70 N.J.Super. 313, 317-18, 175 A.2d 438 (App.Div.1961), and the authorities cited there, including Blanche v. Rogers, 26 N.J.Eq. 563, 567 (E. & A.1875), Thompson, Real Property, § 162 (1939) and Brown, Personal Property, § 137 (1936).
N.J.S.A 54:4-1(a) includes as part of its “real property taxable” whatever of the greenhouse, its attachments and appurtenances, *495 are “ordinarily intended to be permanently affixed” to the land (or its improvements).[10] The issue is a fact issue.
Taxpayer’s glass greenhouse is an enclosure for growing plants year round. Its nature requires that it be constructed of glass or a clear plastic. Taxpayer’s is glass, because glass offers ventilation capabilities superior to plastic. Taxpayer’s glass house is constructed with precisely the structure it needs to enjoy a useful life of at least thirty years. It is designed to last.
The greenhouse structure is elaborate. Its 500 concrete piers are responsive to the nature of what they support. The piers need not have any more mass or connectedness than they have. The structure’s design responds to the needs of its materials. There is no evidence that the design is intended to accommodate mobility of the house itself. To the contrary, the design gives the impression of permanence.
Taxpayer invested nearly $600,000 to install and equip the structure. It is state of the art — complete with automated heat, electrical, ventilation, and irrigation systems. The only evidence of movement of houses such as Taxpayer’s involves the sale to third parties of “used” houses separate from their real property. There is no evidence here of the movement of a house from location to location upon the owner’s property, for example. Accepting the testimony of Taxpayer’s witnesses we conclude that a house such as Taxpayer’s which cost approximately $8.94 per square foot to construct, ($590,000 -s- 66,000) would bring only $1.00 per square foot, if sold separate from the land. Such depreciation in value supports a conclusion that the structure, the assemblage of glass, and metal, nuts and bolts, is “ordinarily intended” to remain permanently affixed. The investment by Taxpayer in the structure is recouped by using the house to produce income in Taxpayer’s business straight through from the *496 beginning to the end of its useful life. A functioning greenhouse must be “in place” in some location.
We are compelled on the facts in this case to hold that the manifest (objective) intention at the time of annexation was “to make the [greenhouse] ... a permanent accession to the ... [owner’s interest in the “freehold”]---- [This inference proceeds from] the nature of the articles affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made”. Teaff, supra, 1 Ohio St. at 530. It is further held that the greenhouse is real property under the uniformity clause and therefore must be taxed, absent a valid exemption. Taxpayer has not argued that the assessment for either the 1993 or 1994 tax years included items of personal property under N.J.S.A. 54:4-l’s “(a)” test. It is, then, unnecessary to determine on an item by item basis what property affixed or attached to the greenhouse has become, by annexation, real property and subject to taxation.
The questions remaining, then, for 1994 are whether N.J.SA 54:4-23.12 applies to the greenhouse; and if so, whether that exemption is valid. The language of N.J.S.A. 54:4-23.12 which Taxpayer relies upon was added in 1993:
As used in this [Farmland Assessment Act] “single-use agricultural or horticultural facility” means property employed in farming operations and commonly used for either storage or growing, which is designed or constructed so as to be readily dismantled and is of a type which can be marketed or sold separately from the farmland and buildings and shall include but not be limited to ... greenhouses----
It is clear on the face of the statute that Taxpayer’s greenhouse is within the definition of “structures” to be excluded from N.J.S.A 54:4-1’s “real property taxable”. Greenhouses which are employed in a named horticultural activity and may be readily, dismantled and sold separate from the farmland are specifically named in the statute. The intent to reach a greenhouse such as Taxpayer’s is also clear in the Senate Community Affairs Committee Statement to Senate, No. 16 (June 1,1992):
Pursuant to ... P.L.1979, c. 70 [N.J.S.A. 54:4-23.12] ... the term “structures” was amended to exclude temporary demountable plastic covered framework made up of portable parts with no permanent understructures or related apparatus, commonly *497 known as seed starting plastic greenhouses. This bill would further expand that exemption by extending it to other property employed in farming operations and commonly used for either storage or growing____ These include but are not limited to silos, greenhouses____
We agree with the Township that the exemption is void as it attempts to confer the identical preference as was stricken in Switz v. Kingsley, 37 N.J. 566, 182 A.2d 841 (1962), with regard to land, and N.J. State League of Municipalities v. Kimmelman 105 N.J. 422, 522 A.2d 430 (1987), with regard to improvements. We hold that N.J.S.A 54:4-23.12 as applied to Taxpayer’s Dutch greenhouse results in an exemption violative of the mandates of N.J. Const. art. VIII, § 1, ¶ 1. As applied to Taxpayer’s greenhouse the exemption is void.
Valuation — Tax Years 1993 and 1994
Taxpayer seeks a determination of a “reasonable depreciation factor” to apply for assessment purposes in each tax year. Taxpayer offers, however, no valuation expert nor any other evidence to establish the cost “new” of the greenhouse. It has neither agreed nor disagreed as to the Township’s conclusions on actual cost. Taxpayer has not offered any opinion of the greenhouse’s true value under any of the generally recognized appraisal theories (e.g. cost, income, and market approaches). It has not advanced an opinion to whether items of property affixed may be excluded under N.J.S.A 54:4:-1(a). This court is not free to ignore the presumption of validity which “attaches to the quantum, of the tax assessment”. Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985). Taxpayer has the burden of proving that the assessment appealed from is erroneous. That burden is met only by evidence that is “definite, positive and certain in quality and quantity.” Id. As Taxpayer has failed to meet its burden, the assessment must be affirmed for both tax years.
The Tax Court Administrator will be directed to enter judgment in accordance with the foregoing, affirming the assessment for each of tax years 1993 and 1994.

 N.J.S.A. 54:4-23.12(a) provides:
All structures, which are located on land in agricultural or horticultural use ... together with the additional land used in connection therewith, shall be valued, assessed and taxed by the same standards, methods and procedures as other taxable structures and other land in the taxing district; provided, however, that the term "structures" shall not include "single use agricultural or horticultural facilities". As used in this Act, “single-use agricultural or horticultural facility” means property employed in farming operations and commonly used for either storage or growing, which is designed or constructed so as to be readily dismantled and is of a type which can be marketed or sold separately from the farmland and buildings and shall include, but not be limited to, temporary demountable plastic covered framework made up of portable parts with no permanent understructures or related apparatus, commonly known as seed starting plastic greenhouses, or other readily dismantled silos, greenhouses, grain bins, manure handling equipment, and impoundments, but shall not include a structure that encloses a space within its walls used for housing, shelter, or working, office or sales space, whether or not removable.

 Taxpayer’s classification argument relies upon the 1993 amendment to N.J.S.A. 54:4-23.12. The effective date of that amendment is August 12, 1993, *480 L.1993, c. 251, § 1. Taxpayer does not seek nontaxable classification for tax year 1993.

 That statute currently provides, so far as relevant here:
All property real and personal within the jurisdiction of this State not expressly exempted from taxation or expressly excluded from the operation of this chapter shall be subject to tax annually under this chapter. Such property shall be valued and assessed at the taxable value prescribed by law. Land in agricultural use which is being taxed under the “Farmland Assessment Act of 1964” ... shall be valued and assessed as provided by that act---- Personal property taxable under this chapter shall include, however, only the machinery apparatus or equipment of a petroleum refinery ... and the tangible goods and chattels exclusive of inventories, used in [the] business of local exchange telephone, telegraph and messenger systems, companies and corporations or associations subject to tax under P.L.1940, c. 4 (C.54:30A-16 et seq.) ... and shall not include any intangible personal property whatsoever____ Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the *486 real property or [to] an appurtenance thereto, unless: (a)(1) the personal property so affixed can be removed or severed without material injury to the real property; (2) the personal property so affixed can be removed or severed without material injury to the personal property itself; and (3) the personal property so affixed is not ordinarily intended to be affixed permanently to real property____

 Art. VIII, § 1,112 of the 1947 Constitution provides:
Exemption from taxation may be granted only by general laws. Until otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued. Exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.

 In general "personal property" per se is no longer subject to ad valorem taxation in this State. For a history of ad valorem taxation of personal property see L.1918, c. 236, § 202, [1924 Suppl. § 208-66d(202) ] imposing tax upon all tangible and intangible, real and personal property; L.1945, c. 163, § 1, exempting intangible personalty; L.1960, c. 51, § 23 defining “classes" of tangible personal property including; (i) property used in business; (ii) property used in farming operations; (iii) household and personal effects; and (iv) all other taxable personalty and, as to the rate of tax for each class, N.J.S.A. 54:4-9 — 54:4-11, L.1960, c. 51, § 8; Business Personal Property Tax Act, L.1966, c. 136, N.J.S.A. 54:11A-1 et seq. preempting taxation of “business personal property” to the State; L.1966, c. 138, § 1 restricting the class of "personal property taxable” under N.J.S.A. 54:4-1 "Personal property taxable under this chapter shall include, however, only tangible goods and chattels, exclusive of inventories, used in business of telephone, telegraph and messenger systems, companies, corporations or associations subject to tax under ... [54:30A-16 et seq.)----; L.1992, c. 24, § 3, in the opening paragraph, expanded personal property taxable to include particular machinery, apparatus or equipment of a petroleum refinery; and L.1993, c. 174, § 1, repealed the tax on "business personal property".

 Art. VIII, § 1 par. 1 (a) provides:
Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.

 That section provides:
For purposes of chapter 4 of Title 54 ... and notwithstanding the provisions of R.S. 54:4-1, a storage tank having a capacity of more than 30,000 gallons is deemed to be real property. The fact that products are mixed, blended, heated or subjected to a similar nonproduction process within a storage tank shall not in itself render that tank personal property.

 N.J. Const. art. VIII, § 1, K 1(b) provides:
(b) The Legislature shall enact laws to provide that the value of land, not less than 5 acres in area, which is determined by the assessing officer of the taxing jurisdiction to be actively devoted to agricultural or horticultural use and to have been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, for local tax purposes, on application of the owner, be that value which such land has for agricultural or horticultural use. Any such laws shall provide that when land which has been valued in this manner for local tax purposes is applied to a use other than for agriculture or horticulture it shall be subject to additional taxes in an amount equal to the difference, if any, between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had the land been valued and assessed as otherwise provided in this Constitution, in the current year and in such of the tax years immediately preceding, not exceeding 2 such years in which the land was valued as herein authorized____

 No argument was made regarding the applicability of N.J.S.A. 54:4-1 (b) to the greenhouse.

 The statute's slightly different articulation of the Teaff intention test is of no consequence because we read “ordinarily” to be in substance the same objective test as described in Teaff.